[No. A061456. First Dist., Div. Three. Aug. 3, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
TRACY ARTHUR STONE, Defendant and Appellant.

## COUNSEL

Kyle Gee, under appointment by Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JENKINS, J.**\*—Tracy Arthur Stone appeals his conviction on numerous charges arising from his abduction of and sexual assaults on two young children. During the court trial, he stipulated to admission of one victim's grand jury testimony and to having the sanity-phase evidence heard before the court made a finding on the guilt phase. On appeal, he contends the advisements he received and the waivers he made on the record in the course of so stipulating were insufficient. We affirm.

### FACTS

The issues raised do not require a detailed recitation of the evidence.

Jessica M., an infant less than one year old, was abducted from her family home in Concord about 8:30 p.m. and recovered in West Pittsburg about two hours later. In addition to scratches, she had a vaginal laceration and redness indicating penetration. Defendant was linked to the crime by dog tracking from the point of Jessica's recovery to a convenience store where a surveillance camera showed he had been at 10:58 p.m., and by a comparison of

---

\*Judge of the Alameda Superior Court sitting under assignment by the Chairperson of the Judical Council.

fibers from defendant's carpeting and clothing to those found on Jessica and her clothing.

Three months later, Meghan R., a six-year-old child, was abducted from her mother's home in West Pittsburg around 3 a.m. and released near home about 4 a.m. the next day. In her grand jury testimony, which was admitted by stipulation at trial, she described her kidnapper and the extensive course of molestation to which he subjected her. She was initially taken to a school, where the abductor orally copulated her. Then he took her to a house and removed the duct tape he had put over her eyes. Although Meghan did not identify defendant by face, she was able to describe and identify photographs of defendant's tattoos, a scar on his back, and various items in his bedroom, including the paraphernalia he used to inject her with a drug. In addition, one of Meghan's fingerprints was found on a toilet seat in defendant's house.

The abductor told Meghan he took her for sex. After showing her an adult magazine, he used his finger to lubricate her vagina and anus with grease, raped her, sodomized her "a few" times, forced her to orally copulate him more than once, and rubbed his penis between her legs until he ejaculated on her. He injected Meghan in both arms with a drug that made her vomit and injected himself with the same kit.

It was stipulated the physician who examined Meghan after her return would testify his examination results were consistent with the history she gave and her blood tested positive for methamphetamine.[1]

The defense called an expert on methamphetamine intoxication who testified high doses of methamphetamine can cause confusion, delusions and hallucinations. The defense also called an Antioch police detective who testified he believed defendant had a burglary modus operandi of entering occupied houses at night through an open door or window, taking things but not hurting anyone.

At the sanity phase, defense experts opined defendant was suffering from dissociative personality disorder, linked to childhood abuse and addiction to methamphetamine.

---

[1]The record is ambiguous as to what was stipulated regarding the doctor who examined Meghan. Although counsel initially stated it as a stipulation to the substance of the evidence the doctor would give if called to testify at trial, the court later asked defendant to stipulate to admission of the doctor's grand jury testimony, and defendant did so. Before the grand jury, the doctor testified he found "multiple trauma" in the vaginal or perineal examination.

## DISCUSSION

### I. *Stipulation to Admission of Meghan's Grand Jury Testimony*

 Defendant contends the advisements given and waivers obtained when he agreed to allow Meghan's grand jury testimony in lieu of her appearance at trial were insufficient under *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086] (hereafter *Bunnell*). In particular, he complains there was no express advice or waiver as to the privilege against self-incrimination, and the potential punishment he faced if convicted was inadequately explained.[2] The People argue the evidentiary stipulations here were not a "submission" requiring full on-the-record advisements under *Bunnell*. Assuming they were a submission, the People further contend they were not tantamount to a plea of guilty. We agree with the latter point. Assuming, without deciding, defendant "submitted" the case on the basis of the prior testimony, the submission bore insufficient resemblance to a guilty plea for the advisements to be constitutionally required. Moreover, defendant has not shown prejudice under the standard applicable to nonconstitutional error.

 "We now hold that *Bunnell*'s requirement of a self-incrimination advisement and waiver is not constitutionally compelled for submissions that are not tantamount to a plea of guilty. If the submission does not amount to a slow plea of guilty, there is no involuntary confession of guilt. *Boykin-Tahl*[3] admonishments and waivers in such contested submissions are required only to effectuate the judicial policies of minimizing error, maximizing protection of defendants' constitutional rights, and eliminating the necessity of requiring trial and appellate courts to determine whether a submission is a slow plea. A trial court's failure to comply with this judicial rule of criminal procedure requires reversal only if it is reasonably probable a result more favorable to the defendant would have been reached if he had been properly advised. (Cal. Const., art. VI, § 13; *People* v. *Watson* [1956] 46 Cal.2d [818,] 836 [299 P.2d 243].)" (*People* v. *Wright* (1987) 43 Cal.3d 487, 495 [233 Cal.Rptr. 69, 729 P.2d 260], fn. omitted.)

---

[2]Defendant had previously waived jury trial, and, at the time of the stipulations, the court expressly reminded him of that right and obtained another express waiver. Defendant was also explicitly advised of his right to confront and cross-examine witnesses, and that he would be waiving that right as to the witnesses, including Meghan, to whose testimony he was stipulating. He also was advised Meghan's grand jury testimony was incriminating and would be accepted by the court as true if not controverted, although there was no explicit discussion of "self-incrimination." Finally, the determination of sentence was discussed in detail, although no specific maximum was stated.

[3]*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].

■ A "slow plea" has been defined as follows: "It is an agreed-upon disposition of a criminal case via any one of a number of contrived procedures which does not require the defendant to admit guilt but results in a finding of guilt on an anticipated charge and, usually, for a promised punishment." (*People* v. *Tran* (1984) 152 Cal.App.3d 680, 683, fn. 2 [199 Cal.Rptr. 539].) "Perhaps the clearest example of a slow plea is a bargained-for submission on the transcript of a preliminary hearing in which the only evidence is the victim's credible testimony, and the defendant does not testify and counsel presents no evidence or argument on defendant's behalf. . . . [¶] Submissions that are not considered slow pleas include those in which . . . the facts revealed at the preliminary examination are essentially undisputed but counsel makes an argument to the court as to the legal significance to be accorded them. [Citation.]" (*People* v. *Wright, supra,* 43 Cal.3d at p. 496.) "If it appears on the whole that the defendant advanced a substantial defense, the submission cannot be considered to be tantamount to a plea of guilty. Sometimes, a defendant's best defense is weak. He may make a tactical decision to concede guilt as to one or more of several counts as part of an overall defense strategy. A submission under these circumstances is not a slow plea . . . ." (*Id.* at p. 497.)

■ Defendant did not concede guilt of the offenses against Meghan by agreeing to the admission of her grand jury testimony and making the related stipulations.[4] At the time, defendant stated he had no intent to plead guilty and was making the stipulation only to avoid forcing Meghan to testify again. After the court warned defendant Meghan's testimony was incriminating and could well result in his conviction, defense counsel asked the court to make clear it was not prejudging defendant's guilt, in particular whether he entertained the necessary mental state. The court assured counsel it was not prejudging; it meant only it would probably find defendant guilty if Meghan's testimony was uncontroverted and established all the elements of the charged offenses.

The defense presented two witnesses whose testimony tended to cast doubt on his guilt of the crimes against Meghan. The expert testimony regarding methamphetamine intoxication suggested defendant may not have formed the specific intents required for some of the charged offenses, while the Antioch police detective's testimony presumably was intended to support a defense of misidentification. That this evidence was not compelling shows only that defendant had a weak defense, not that he conceded guilt.

In his guilt-phase summation, defense counsel was very far from conceding guilt on the charges involving Meghan. He argued, first, the charge of

---

[4]In connection with the stipulation to admit the transcript of Meghan's grand jury testimony in lieu of her testimony at trial, defendant stipulated to the meaning of certain terms in her testimony and the identity of certain photographs.

burglary (count 8) was unproven because there was no evidence of entry. He pointed out the stipulation admitting Meghan's prior testimony "doesn't mean I can't argue it's [*sic*] credibility." He contended Meghan's brief testimony that some of the acts were repeated was insufficient to support multiple counts of the same offense. He specifically urged acquittal on counts 16 and 17, charges of penetration with a foreign object, because Meghan had testified the digital penetrations were for lubrication rather than for sexual arousal or gratification. He maintained Meghan's testimony upon which a charge of intimidating a witness (count 23) was based "doesn't fit the statutory definition . . . ."[5] Finally, he argued the court should consider the expert testimony regarding methamphetamine intoxication in determining whether defendant entertained the required specific intents.[6]

Finally, the court's actual verdict shows defendant's conviction was not a " 'foregone conclusion.' " (*People* v. *Wright, supra,* 43 Cal.3d at p. 496.) Apparently persuaded by part of the defense argument, the court found defendant not guilty on counts 16 (foreign object rape), 17 (same), and 20 (sodomy). In sum, defendant expressly stated he was not conceding guilt, he presented evidence on his own behalf, argued for acquittal on some or all of the charges, and was actually acquitted on three of the charges involving Meghan. The stipulations he made were not a device to concede guilt or facilitate an agreed-upon disposition, nor did they have those effects. Although the opportunity to cross-examine Meghan was given up, defendant challenged the credibility and legal sufficiency of her testimony in several respects. The defense succeeded in part. Thus, the stipulations were not tantamount to a guilty plea, and the full panoply of on-the-record *Boykin-Tahl* advisements was not constitutionally compelled.

We turn, then, to the question of prejudice from the court's failure expressly to advise defendant and obtain a waiver of his privilege against self-incrimination and failure fully to advise him of the consequences of conviction. We conclude defendant has not demonstrated a more favorable outcome was reasonably likely had he been more fully or explicitly advised in these respects. The court expressly advised defendant it regarded Meghan's testimony as incriminating, so much so the testimony would likely lead to conviction if uncontroverted and found legally sufficient. Defendant

---

[5]Meghan testified the abductor, before releasing her, threatened to come back and kill her "[i]f I saw his face."

[6]Counsel also argued the court could consider, on the issue of specific intent, the sanity-phase testimony, which the court, by stipulation, heard prior to rendering a guilt-phase verdict.

stated he understood this and still wanted to make the stipulation. Thus, he was advised in substance of his right not to incriminate himself and agreed knowingly to a limited waiver of the right, although the phrase "self-incrimination" was not used.

As to the consequences of conviction, the court had at an earlier time (when defendant waived jury trial) told defendant probation would be precluded and he faced, potentially, "a very, very lengthy sentence." During the discussion of the stipulations, the court explained the actual sentence would depend not only on what, if any, charges defendant was convicted on, but also on whether the court chose to or was required to impose full consecutive sentences for the forcible sex crimes charged. In particular, the court noted each count subject to full consecutive sentencing could add eight years. At the time, there were 11 such counts pending relating to Meghan. (Pen. Code, § 667.6, subds. (c), (d).) When defendant said he did not understand the sentencing alternatives for the forcible sex crimes, he was given time to, and did, confer with counsel. On inquiry from the court, counsel stated he had previously discussed the range of possible sentences with defendant and, in particular, had discussed the "maximum possibilities" to be encountered under mandatory consecutive sentencing.

Defendant thus knew Meghan's testimony and the related stipulations would tend to incriminate him. He knew he faced a very long sentence, possibly composed of several fully consecutive eight-year terms, if he was convicted. Counsel had discussed with him the maximum possible sentence. He knew he had the right to refuse the stipulation and to have Meghan testify in court so she could be confronted and cross-examined. He nonetheless chose to make the stipulations, sparing Meghan from an additional court appearance. It is unlikely he would have made a different decision had the court informed him in so many words of his right not to incriminate himself, stated on the record a specific maximum sentence, or told him of the requirement he register as a sex offender.[7]

Nor has defendant demonstrated a more favorable verdict was likely had he declined the stipulations. The evidence Meghan had been abducted and molested was not limited to her own testimony. Her presence in defendant's

---

[7]The same considerations concerning the fullness of the court's advice and defendant's knowledge lead us to conclude the stipulations were made voluntarily and intelligently. Even if more explicit advisements were constitutionally required, therefore, reversal of the conviction would not be required. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1175 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Knight* (1992) 6 Cal.App.4th 1829, 1831-1832 [8 Cal.Rptr.2d 827].)

house, similarly, was independently demonstrated by her fingerprints on his toilet seat. Meghan's testimony as to details was extraordinarily clear and confident for a witness her age; it is highly unlikely cross-examination would have shaken her credibility so fully as to clear defendant of all charges involving her. Indeed, it is equally likely on cross-examination she would have amplified the details of the various acts of molestation, resulting in convictions on the three counts on which defendant was acquitted. The record simply does not show a reasonable probability the outcome would have been more favorable to defendant had he been given fuller advisements. (*People* v. *Wright, supra*, 43 Cal.3d at p. 499.)

## II. *Waiver of Bifurcated Sanity Trial*

■ Upon conclusion of the guilt-phase evidence, defendant personally and with counsel's concurrence agreed to continue immediately with presentation of the sanity-phase evidence, without a prior determination of guilt; defendant had a right to such a prior determination under Penal Code section 1026, subdivision (a). Defendant now maintains the waiver—which was taken without any *Boykin-Tahl* advisements—was " 'tantamount to a guilty plea' " because it allowed the court to consider, in reaching its guilt verdict, assertedly incriminating sanity-phase testimony from examining psychiatric experts.

We reject the contention for several reasons. First, nothing in the record suggests the court considered any damaging sanity-phase testimony in reaching its guilty verdicts. The stipulation did not provide for such cross-admissibility. Separate arguments were given on guilt and sanity, and the prosecutor, in guilt-phase argument, did not rely on or refer to any testimony of the sanity-phase experts. Second, defendant has not specifically identified any incriminating testimony given by the sanity-phase experts. He claims there was testimony as to " 'fragmented memory' " of the events, but does not point us to any portion of the record. Third, even accepting the premise the stipulation allowed incriminating sanity-phase evidence to be in the guilt phase—a premise we do not accept—it was still not tantamount to a guilty plea. As discussed above, defendant did not concede guilt: he introduced evidence on his own behalf, cross-examined prosecution witnesses on the Jessica M. counts, and argued for and actually obtained acquittal on some counts. In the absence of a showing of prejudice, which defendant has not made, reversal would not be called for, even if the waiver of bifurcation resulted in the use of incriminating sanity-phase evidence.

## DISPOSITION

The judgment of the superior court is affirmed.

Merrill, Acting P. J., and Chin, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 17, 1994. Mosk, J., was of the opinion that the petition should be granted.