Filed 5/3/13

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>JOE LYNN MCCOY,<br><br>       Defendant and Appellant. | C067380<br><br>(Super. Ct. No. 09F07723) |

APPEAL from a judgment of the Superior Court of Sacramento County, Lloyd G. Connelly, Judge. Affirmed in part and reversed in part.

Kat Kozik, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Eric L. Christoffersen and Brook Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III, IV, VI, and VII of the discussion.

1

Defendant Joe Lynn McCoy physically and sexually assaulted his girlfriend, Cindy H., fracturing her spine during the attack and rendering her a quadriplegic. Because Cindy H.'s medical condition provided reasonable grounds to fear she would be unable to testify at trial, she was examined conditionally during the preliminary hearing via two-way video. At trial, as anticipated, the video of this examination was played for the jury because Cindy H. was unable to testify. Defendant was convicted of torture (count 2), inflicting corporal injury on a cohabitant (count 3), and unlawful sexual penetration with a foreign object (count 4). With respect to count 3, the jury found defendant personally inflicted great bodily injury causing paralysis. With respect to count 4, the jury found defendant personally inflicted torture.[1] The trial court sentenced defendant to state prison for a term of 25 years to life and imposed other orders.

On appeal, defendant asserts: (1) the introduction of Cindy H.'s conditional examination violated his Sixth Amendment right of confrontation because (a) the video equipment used during the conditional examination was not set up to allow him to confront his accuser "face-to-face," and (b) he possessed a substantially different interest and motive in cross-examining Cindy H. during the conditional examination than he did at trial; (2) the trial court further violated defendant's Sixth Amendment right of confrontation, as well as his Fourteenth Amendment right to due process, by allowing the prosecution to amend the information to add a one-strike torture allegation to count 4 after the conditional examination; (3) the trial court prejudicially erred when it denied defendant's motion for a continuance rather than construe that motion as a request to discharge the jury and declare a mistrial; (4) the trial court prejudicially erred in admitting into evidence a prior act of domestic violence under Evidence Code section

---

[1] The jury was unable to reach a verdict on count 1, which charged defendant with attempted murder. Nor could the jury reach a verdict on a one-strike great bodily injury allegation attached to count 4.

2

1109; (5) defendant's conviction in count 4 for unlawful sexual penetration must be reversed because of instructional error; (6) the trial court "mishandled" defendant's motion to replace his appointed counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); and (7) the abstract of judgment must be corrected.

The Attorney General concedes there is an error in the abstract of judgment and also points out that the trial court neglected to impose sentence on counts 2 and 3 before staying their execution pursuant to Penal Code section 654,[2] resulting in an unauthorized absence of sentence. We accept the concession, agree that sentence must be imposed on counts 2 and 3, and remand the matter to the trial court for this limited purpose.

Turning to defendant's remaining contentions, the first is forfeited and the remainder fail on the merits. As we explain, defendant's failure to object to the manner in which the video equipment was set up during the conditional examination has forfeited the claim that he was deprived of the ability to confront his accuser "face-to-face." Had an objection been made, any error in failing to turn the camera to show defendant to Cindy H. during her testimony could easily have been remedied. And because defendant did not possess a substantially different interest and motive in cross-examining Cindy H. during the conditional examination than he did at trial, we cannot conclude that playing this examination for the jury violated his confrontation rights. Nor did the trial court abuse its discretion or violate defendant's constitutional rights by allowing the prosecution to amend the information to add the one-strike torture allegation to count 4 or by denying his request for a continuance. We also conclude the trial court did not err in admitting into evidence the prior incident of domestic violence. As we explain, while this particular incident took place more than 10 years before the charged crimes, the trial court did not abuse its discretion in concluding that admission of this evidence was in the

---

[2] Undesignated statutory references are to the Penal Code.

3

interest of justice. Nor was the jury improperly instructed with respect to the crime of unlawful sexual penetration. Finally, we disagree that the trial court mishandled defendant's *Marsden* motion.

## FACTS

In September 2006, defendant and Cindy H. began dating. At the time, Cindy H. lived in an apartment on La Riviera Drive in Sacramento with her two teenage sons. In March 2007, defendant moved into the apartment. By the following March, both of Cindy H.'s sons had moved out of the apartment. Defendant's violence against Cindy H. began three months later.

The first violent incident occurred in June 2008. Cindy H. was drinking with defendant at a bar when she told him she wanted to go home. Defendant refused to leave. Cindy H. left the bar and started to walk home. Defendant then called a cab and was the first to reach the apartment. When Cindy H. walked through the door, defendant "backhanded" her and told her to take off her clothes. While yelling, defendant then ripped her shirt off and hit her several times on the side of her leg. Two days later, Cindy H. went to work with a black eye and bruises on her leg. A coworker took pictures of the injuries.

Between June 2008 and September 2009, defendant physically assaulted Cindy H. "four or five" times in the apartment, each time causing black eyes. On one of these occasions, he hit her in the head with something that caused two cuts and resulted in "quite a bit of blood on the carpet." Each time, defendant had been drinking. And each time, he stood between Cindy H. and the door and "would either tell [her] to take [her] clothes off or he would force -- forcefully remove [her] clothes." As Cindy H. described the impetus for these assaults, "[h]e would get it in his head that [she] was cheating on him or that [she] was with somebody else."

The last violent incident continued this theme and resulted in Cindy H.'s quadriplegia. On September 15, 2009, she and defendant looked at houses with a realtor.

4

At some point, they began to argue and returned to the apartment. Cindy H. changed into a bathing suit and went to a place along the American River she and defendant frequented. She brought a CD player, a book, a bottle of wine, and some lemon-lime soda. She did not invite defendant to come along. While at the river, she talked to defendant on the phone and asked if he was going to "come down and meet [her] at the river." Defendant seemed "irritated" and said that "he would be going the next day without [her]."

Defendant drank alcohol at the apartment while Cindy H. was at the river. When she returned to the apartment, defendant "accused [her] of getting out of somebody's truck." She responded that "he was seeing things." Defendant "became angry," ripped the top half of her bathing suit, took her CD player and "stomped" on it, emptied her purse onto the floor, and then told her to "clean up the mess." Cindy H. removed the entire bathing suit, placed it in the trash, and started picking up defendant's mess. As she did so, defendant hit her in the head with either his palm or the back of his hand and told her to "hurry up." She ended up lying face down on the carpet near the front door. Defendant then grabbed both of her legs and forced them up and forward towards her head. Cindy H. felt a "pop" and a "burst of heat," and "still [lying] face down, [she could] see [her] legs in front of [her head]." Realizing she could not move her limbs, Cindy H. told defendant he had broken her back. He responded that she "wasn't hurt that bad." Defendant then turned her over and kicked her several times in the vaginal area, uttering vile epithets as he did so. As a final insult to her human dignity, defendant "inserted three double A batteries into [Cindy H.'s] rectum," and then removed the third battery, which was "now covered with fecal matter, and he smear[ed] it on [her] face."

At some point, defendant dragged Cindy H. into the hallway and called Anthony Colding, the maintenance man at the apartment complex. Defendant told Colding he "needed help" with Cindy H., but did not offer any details. Colding and his wife, Shelonar Ballard, drove from their home in South Sacramento to defendant's apartment

5

complex and arrived about 30 minutes later. In the meantime, Cindy H. pleaded with defendant to call for an ambulance. He continued to insist she was not seriously hurt. When Colding and Ballard arrived at the complex, Colding went to the apartment and Ballard remained in the car. The lights in the apartment were turned off. After knocking on the door and receiving no answer, Colding called defendant and said he was at the front door. The door opened and defendant let him inside.

Colding found Cindy H. lying naked in the hallway where defendant had left her. She was asking for help. Colding asked defendant: "What happened to her?" Defendant answered that he "stuck some batteries up in her butt." Defendant and Colding then picked her up, carried her to the bedroom, and placed her on the bed. As they did so, Cindy H. begged them not to move her. Realizing Cindy H. was seriously injured, Colding told defendant he "need[ed] to call the ambulance." His response: "That B[itch] don't need no help." Defendant then offered Colding a beer. Colding declined and returned to Ballard, who was still in the car. After Colding told Ballard what he had seen inside the apartment, he again called defendant, this time to allow Ballard to talk to Cindy H. on the phone. Ballard told her to say "rock" as a code word to indicate she needed help. Cindy H. did so. Ballard hung up and called 911.

Sheriff's deputies arrived at the apartment during the early morning hours of September 16, 2009, about 40 minutes after the 911 call. They knocked repeatedly and announced their presence, but no one answered the door. Again, the lights in the apartment had been turned off. There were no sounds coming from the apartment. Eventually, they left. Cindy H. explained she did not call out to the deputies for help because, based on prior experience, she was afraid defendant would strangle her if she made a sound.

After the deputies left, defendant fell asleep. Cindy H. woke him up at some point, told him she was in pain, and asked to be taken to the hospital. Defendant told her to "leave him alone so he could go back to sleep." Later in the morning, she told

6

defendant she needed to call in sick to work. Defendant made the phone call and held the phone for her while she told her manager she was in a car accident and would not be coming in. She then told defendant several more times she was in pain and needed help. Each time, he refused to call for help. Instead, he placed hot towels on her arms and told her taking a hot bath would help. When defendant tried to help her to stand beside the bed, her legs "folded" under her weight. Defendant told her to "put [her] arms around him and help him." She responded: "I can't, you broke my back. I can't move my arms, I can't move my legs." Defendant lowered her to the ground next to the bed.

At this point, defendant suggested taking Cindy H. to the hospital in the back of his pickup truck, saying he did not want to call an ambulance because he "couldn't go to jail." Defendant then started packing a bag as if he were getting ready to leave. Cindy H. asked if she would ever see him again. Defendant responded: "What do you think?" She then suggested he call 911 and leave the front door unlocked for the paramedics. Defendant decided to call an ambulance company directly rather than dialing 911. Cindy H. promised to tell medical personnel and law enforcement that she was attacked while at the river the night before, and she managed to drive home before losing the ability to move. At Cindy H.'s direction, defendant made sure the ambulance company carried a backboard. He also told them lights and sirens would not be necessary. While waiting for the ambulance to arrive, defendant partially dressed Cindy H. and placed a cervical collar, which she had from a previous injury, around her neck.

True to her word, Cindy H. told paramedics she was attacked by a woman the night before while partying at the river, she felt "minor pain" when she got home, put on the cervical collar, and woke up unable to move. She was taken to Mercy San Juan Medical Center. Doctors diagnosed a fracture and dislocation of the cervical spine at the C5/C6 location, which rendered her permanently paralyzed below her chest. She had bruises on her lower abdomen, legs, and arms. The two batteries that remained in her rectum were removed. She was then placed in traction to realign the spine before being

7

taken to the operating room where spinal surgery was performed. When the surgeon asked how she received the spinal injury, she again claimed to have been attacked by a woman the night before.

Defendant was arrested about three weeks later at a Motel 6 in South Sacramento.

## DISCUSSION

## I

### *Admission of the Conditional Examination*

Defendant contends the trial court violated his Sixth Amendment right of confrontation by admitting into evidence Cindy H.'s conditional examination. Specifically, he argues: (1) the video equipment used during the conditional examination was not set up to allow him to confront his accuser "face-to-face," and (2) he possessed a substantially different interest and motive in cross-examining Cindy H. during the conditional examination than he did at trial because a one-strike torture allegation was added to count 4 after the conditional examination was conducted. The first of these contentions has been forfeited. The second fails on the merits.

### A.

### *Statutory Framework*

In order to place defendant's contentions in context, we begin with a brief overview of the statutory scheme governing conditional examinations.

In all criminal cases, "other than those for which the punishment may be death" (§ 1335, subd. (a)), the prosecution may apply for a court order compelling a material witness to submit to a conditional examination if the witness "is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult." (§ 1336, subd. (a).) The prosecution may also apply for such an order in cases in which the "defendant has been charged with a serious felony or in a case of domestic violence," even where the punishment may be death, "if there is evidence that the life of the witness

8

is in jeopardy." (§§ 1335, subd. (b), 1336, subd. (b); *People v. Jurado* (2006) 38 Cal.4th 72, 113 ["conditional examination of a prosecution witness is permitted in a capital case when the witness's life is in jeopardy"].)

The application for a conditional examination "may be made to the court or a judge thereof, and must be made upon three days' notice to the opposite party." (§ 1338; but see *People v. Frank* (1933) 132 Cal.App. 360, 363 [order shortening time may issue upon a proper showing that the exigencies of a given case require notice of less than three days].) "If the court or judge is satisfied that the examination of the witness is necessary, an order must be made that the witness be examined conditionally, at a specified time and place, and before a magistrate designated therein." (§ 1339.) "The defendant has the right to be present in person and with counsel at the examination." (§ 1340, subd. (a).) However, "[i]f the court determines that the witness to be examined is so sick or infirm as to be unable to participate in the examination in person, the court may allow the examination to be conducted by a contemporaneous, two-way video conference system, in which the parties and the witness can see and hear each other via electronic communication." (§ 1340, subd. (b).)

At the conditional examination, "[t]he testimony given by the witness shall be reduced to writing and authenticated in the same manner as the testimony of a witness taken in support of an information. Additionally, the testimony may be video-recorded." (§ 1343.) "[I]f the examination was video-recorded, that video-recording may be shown by either party at the trial if the court finds that the witness is unavailable as a witness within the meaning of Section 240 of the Evidence Code. The same objections may be taken to a question or answer contained in the . . . video-recording as if the witness had been examined orally in court." (§ 1345.) Among other statutory conditions, a witness is "unavailable as a witness" if he or she is "unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (a)(3).)

*Additional Background*

On March 3, 2010, the date set for the preliminary hearing, the prosecution applied for an order directing that Cindy H. be conditionally examined the following day via two-way video conference system.  As the prosecutor explained:  "I learned after being assigned to this courtroom that [Cindy H.], who is a quadriplegic as a result of this crime and who is currently in a care facility, became ill with pneumonia.  We had learned that she was ill with pneumonia yesterday, however, [Cindy H.] indicated to me she felt she'd be well enough to attend today's hearing.  [¶]  What I learned this morning was from the actual care facility who indicated [Cindy H.], her pneumonia [*sic*] had become worse, she was not going to be able to travel.  And they were carefully monitoring her condition in the hopes that the medication or prescription she was on would help alleviate her symptoms.  [¶]  The People became concerned that [Cindy H.] would not be able to travel for some time or may even get worse, her condition may even get worse, so we chose to petition the Court requesting that we conduct a conditional examination of [Cindy H.] given that at this point in time she is unable to travel from her care facility."

Defendant's attorney pointed out that section 1338 required the prosecution to provide him with "three days notice on the issue," and stated:  "I may be willing to waive that and proceed tomorrow, but I'm going to ask the Court to allow me overnight to conduct legal research on this."  The magistrate, Judge David I. Brown, found good cause to continue the preliminary hearing for one day and directed defendant's attorney to *People v. Frank*, *supra*, 132 Cal.App. 360, explaining that the Court of Appeal in that case held a deposition taken under section 1336 was admissible even though the deposition was taken the same day the application was filed rather than on three days' notice.

On March 4, 2010, the preliminary hearing resumed and the same magistrate explained he was treating the prosecution's application for a conditional examination

10

upon less than the statutorily required three days' notice as an application for an order shortening time to conduct the requested examination. Defendant's attorney objected to the lack of notice and further objected that conducting the examination via two-way video conference would violate defendant's Sixth Amendment right to confront his accuser, arguing that "there could be some distinctions and some differences in my ability to cross-examine her today by video conference as compared to her live testimony in the sense that I won't have a chance to look at body language, it may be difficult for me to understand some of her answers or questions, and you would lose the ability to interact with each other in a live format."

The prosecutor responded: "Our concern is, based on what the medical staff is telling us, that pneumonia can be very detrimental to somebody who is a quadriplegic and, therefore, not only was she unable to travel due to her illness but our concern was getting her testimony documented should she become more severely ill." The magistrate interjected: "Or die?" The prosecutor answered: "Yes." The magistrate then granted the application and addressed defendant's attorney: "I believe that you'll have the appropriate opportunity to cross-examine the witness. Admittedly, she won't be present here in the flesh, but she will be present in the flesh in another location where a video conferencing setup will allow us to be able to cross-examine her and ask her questions regarding her recollection of what occurred and her statements relating to her condition. [¶] I assume, of course, that those are going to be the areas that are going to be addressed primarily, as well as her relationship to the defendant, so that we can make a determination based on the witness's own statements."

The conditional examination was conducted during the afternoon session. A two-way video conference system was set up connecting Cindy H. at the care facility with the magistrate, defendant, defense counsel, and the prosecutor in the courtroom. The system enabled the parties to see and hear Cindy H. while she testified and enabled Cindy H. to see and hear each attorney who asked her questions. When the prosecutor finished her

11

examination of Cindy H., the camera was moved to show defendant's attorney during his cross-examination of the witness. The camera was not moved to show defendant to Cindy H. during her testimony, except when she identified him as her attacker. Defendant's attorney did not object to the manner in which the system was set up. Following the preliminary hearing, defendant was held to answer.

On November 9, 2010, the prosecution moved to amend the information to add two one-strike allegations to count 4. The amendment sought to allege defendant inflicted aggravated mayhem or torture during the commission of the sex offense within the meaning of section 667.61, subdivision (d)(3), and that he also personally inflicted great bodily injury during the commission of this crime within the meaning of section 667.61, former subdivision (e)(3).[3] Defendant objected to the amendment, arguing the prosecution introduced "absolutely no evidence" during the preliminary hearing that he inflicted mayhem, torture, or great bodily injury while inserting the batteries into Cindy H.'s rectum. On November 18, 2010, the trial court entertained argument on the proposed amendment and deferred ruling on the motion.

On November 29, 2010, prior to opening statements, the prosecutor advised the trial court Cindy H. was unable to come to court because she was hospitalized due to a bladder infection. The parties agreed to hold opening statements in abeyance until they received further information concerning her condition. That afternoon, the prosecutor informed the trial court Cindy H. was in the intensive care unit due to both a urinary tract

---

[3] At the time of the crime, section 667.61, subdivision (e)(3), provided: "The defendant personally inflicted great bodily injury on the victim or another person in the commission of the present offense in violation of Section 12022.53, 12022.7, or 12022.8." (Stats. 2006, ch. 337, § 33, p. 2640.) Currently, this subdivision provides: "The defendant personally used a dangerous or deadly weapon or a firearm in the commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or 12022.53." (§ 667.61, subd. (e)(3).) Former subdivision (e)(3) can now be found in subdivision (d)(6).

infection and pneumonia, she was nonresponsive, her breathing was being assisted by a breathing tube, and the doctors would know more about her condition in two or three days. The trial court indicated the trial would proceed the following day with opening statements and prosecution witnesses, followed the next day by a hearing on whether the conditional examination would be played for the jury. Defense counsel objected to playing the conditional examination for the jury and explained: "My concern at this point would really be compounding of the conditional examination with the amended information. [¶] The Court is aware that we would have three days notice as required by law. The Court found a reason at the time of the preliminary hearing to allow the District Attorney to not have to comply with that requirement. But now [defendant] is in a position where the conditional exam[ination] is held over his objection without adequate notice, and since that time now an amended information has been filed adding two rather substantial enhancements. One 15 years to life, one 25 [years] to life, which he did not have an opportunity to cross-examine on at the time of the preliminary hearing and conditional exam[ination]." The trial court then entertained further argument regarding the prosecution's motion to amend the information and granted the motion.

On December 1, 2010, the trial court held a hearing outside the presence of the jury concerning whether Cindy H. was unable to testify because of physical illness within the meaning of Evidence Code section 240, subdivision (a)(3). Dr. Daniel Yuen testified concerning her medical condition. He explained that while Cindy H. was being treated for a urinary tract infection, she became unresponsive due to a lack of oxygen and had to be placed on a respirator. A chest x-ray revealed she also had pneumonia. The pneumonia had become worse in the previous two days and Cindy H. was under sedation. Dr. Yuen did not believe she would be able to have the breathing tube removed within a week in order to testify. Dr. Yuen also expressed doubt about whether she would be able to nod her head in response to questions because of her neck injury. In response to a question by defendant's attorney, Dr. Yuen clarified that because quadriplegia makes it

13

difficult to recover from pneumonia, "it may be a long, long time" before Cindy H. would be able to be taken off of the respirator. Indeed, a tracheotomy may be required. The best case scenario was that it would take "at least a month" for her to be able to come into court to testify. The worst case scenario was that she might not survive.

Prior to ruling on the prosecution's request to play the conditional examination for the jury, the trial court allowed both sides to argue the matter. Defense counsel again expressed concern that he did not have an opportunity to cross-examine Cindy H. about the one-strike allegations that were added to the information after the conditional examination. He argued that, because of this, playing the conditional examination for the jury would violate defendant's Sixth Amendment right to confront his accuser. Defense counsel then requested a continuance of an unspecified duration, as he put it, "to see if we can obtain [Cindy H.'s] testimony either live or by video conference." In response, the prosecutor pointed out that the initial information contained a charge of attempted murder with a great bodily injury enhancement and a charge of torture. Thus, argued the prosecutor, during the conditional examination, defense counsel was given an opportunity to cross-examine Cindy H. concerning whether defendant inflicted great bodily injury and torture during his violent assault. Defense counsel responded by reminding the trial court that "this was a situation where the three-day notice requirement was not met and that aggravates."

The trial court granted the request to play the conditional examination for the jury. Citing *People v. Frank*, *supra*, 132 Cal.App. 360, the trial court confirmed the magistrate's ruling with respect to allowing the conditional examination to take place on less than three days' notice. The trial court then reviewed Dr. Yuen's testimony concerning Cindy H.'s medical condition and ruled she was "unavailable as a witness" within the meaning of Evidence Code section 240. The trial court also pointed out that, although notice was shortened, defense counsel had "effectively a full day notice" Cindy H. would be examined conditionally during the preliminary hearing. Moreover,

14

"the initial charges as they existed prior to the preliminary hearing and at the time of the preliminary hearing encompass the fundamental enhancements as they were later sought and amended . . . . [¶] The notable great bodily injury here was the spinal injury which would be consistent with the facts used by the mayhem enhancements, which is pled in the alternative to the torture. As to the torture itself, the violation of . . . Section 206 was asserted at that time in the Information. [¶] So the issue of torture and great bodily injury specifically by way of factual background including the spinal injury were directly immediately at issue in the context of the preliminary hearing."

The conditional examination was played for the jury later that day. As mentioned, the jury convicted defendant of torture, inflicting corporal injury on a cohabitant (with a great bodily injury enhancement), and unlawful sexual penetration with a foreign object (with a one-strike torture enhancement). Defendant's new trial motion, arguing in part that his Sixth Amendment right of confrontation was violated by the trial court's decision to allow the conditional examination to be played for the jury, was denied.

## C.

### *Defendant's Right to Face-to-face Confrontation*

Defendant argues the introduction of Cindy H.'s conditional examination violated his Sixth Amendment right to confront his accuser face-to-face because "the camera equipment was not set up to show [defendant] to [Cindy H.] as she testified." Defendant's failure to object on this ground at a time when the purported error could have been remedied by the magistrate forfeits the issue on appeal.

The failure to raise a claim of federal constitutional error before the trial court forfeits the issue on appeal unless " 'it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for the reasons actually presented to that court, had the legal consequence of violating the

15

Constitution.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809, quoting *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; *People v. Riccardi* (2012) 54 Cal.4th 758, 801; *People v. Redd* (2010) 48 Cal.4th 691, 730 [failure to raise objection based on confrontation clause forfeited claim on appeal].)  Moreover, in order to avoid forfeiture, the defendant must have objected on the "specific grounds" asserted as error on appeal. (*People v. Fuiava* (2012) 53 Cal.4th 622, 689.)

Here, as mentioned, defendant objected to the taking of the conditional examination based on the lack of three days' notice and further objected that conducting the examination via two-way video conference would violate his Sixth Amendment right to confront Cindy H. because "there could be some distinctions and some differences in [defense counsel's] ability to cross-examine [Cindy H.] by video conference as compared to her live testimony in the sense that [counsel] won't have a chance to look at body language, it may be difficult for [counsel] to understand some of her answers or questions, and [they] would lose the ability to interact with each other in a live format." Thus, the constitutional objection went to whether the conditional examination should be conducted in person as opposed to through video conference.  We first note "the right to confrontation is ' "basically a trial right." ' " (*People v. Miranda* (2000) 23 Cal.4th 340, 350-351 [use of hearsay at preliminary hearing does not violate the confrontation clause], quoting *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1079, italics omitted.) Accordingly, defendant did not have a constitutional right to confront Cindy H. at the conditional examination.  However, it was anticipated by all parties that Cindy H.'s conditional examination testimony could be used *at trial*.  Defense counsel's objection may therefore be construed to be that if the conditional examination was held via video conference, then its subsequent admission *at trial* would violate defendant's confrontation rights.  The magistrate (Judge Brown) overruled the objection and allowed the conditional examination to be conducted via video conference.

Later in the day, the video conference system was set up and the conditional examination was conducted. All parties could see and hear Cindy H. while she testified and Cindy H. could see and hear each attorney who asked her questions. Defendant never objected to the fact that the camera equipment was not set up to allow Cindy H. to see him on the screen while she testified. Again, while the confrontation clause generally "guarantees a criminal defendant 'a face-to-face meeting with witnesses appearing before the trier of fact'" (*People v. Lujan* (2012) 211 Cal.App.4th 1499, 1504-1505, quoting *Coy v. Iowa* (1988) 487 U.S. 1012, 1016 [101 L.Ed.2d 857]), this right attaches at trial. However, defense counsel could have objected that if the video conference system did not allow for a face-to-face confrontation, then the subsequent admission of the conditional examination *at trial* would violate defendant's confrontation rights. Defendant could also have objected that such a system would violate section 1340, subdivision (b), requiring a video conference system "in which the parties and the witness can see and hear each other via electronic communication." No such objection was made. Had either objection been made, the magistrate could have ruled on whether to turn the camera during Cindy H.'s testimony to allow her to see defendant.

Moreover, at no time *during trial* did defendant object to the playing of the conditional examination based on the position of the camera equipment during the examination. While defendant objected on confrontation grounds, his objection was based on the argument that he did not have an opportunity to cross-examine Cindy H. about the one-strike allegations added to the information after the conditional examination.

Anticipating forfeiture, defendant argues his failure to object "should be excused as futile." We are not persuaded. The magistrate addressed the logistics of setting up the video conference system and stated: "It's not required that [Cindy H.] sees us, but it certainly is required that we see her. [¶] . . . [¶] And that we have a full and complete opportunity to, you know, examine and cross-examine her. [¶] . . . [¶] It would be

17

preferable if she could see us as well, and there may well be a camera that allows her to do that." Defendant quotes only the first sentence and argues: "Clearly, the magistrate had already made up his mind." We disagree for two reasons. First, the sentence defendant relies upon was in response to the prosecutor's statement she did not believe "the code" required Cindy H. to be able to see the parties while she testified. Thus, the magistrate's response had nothing to do with the requirements of the confrontation clause. Second, immediately thereafter, the magistrate expressed a preference for a video conference system that enabled Cindy H. to see the parties while she testified, which is exactly the system that was set up. And while this system did not show defendant to Cindy H. while she testified, defendant should have made a specific objection based on his right to face-to-face confrontation and given the magistrate the opportunity to rule on the matter.

Finally, we decline defendant's request to address the claim on the merits in order to "forestall a claim of ineffective assistance of counsel." The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) And when, as here, counsel has not had the opportunity to explain his conduct, we will not find ineffective assistance of counsel unless there could be no satisfactory explanation. (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) Here, as the Attorney General argues, defense counsel could have determined that having the camera focus on defendant's face during the conditional examination might have made her "emotional and upset," which may have made her more sympathetic to the jury who ultimately would be viewing the video of the examination later at trial. Defendant's only response is that this explanation "fails to explain why counsel would *later object at trial*, . . . but do so inadequately." But, as we have explained, counsel's objection to the playing of the conditional examination at trial did not include any argument that the placement of the camera equipment prevented defendant from confronting Cindy H. face-to-face. A satisfactory explanation for this would lie in counsel's belief the trial court

18

would have considered the issue forfeited by his failure to object on these grounds at a time when the magistrate could have corrected the purported error.

We conclude defendant has forfeited the contention that playing the conditional examination for the jury violated his Sixth Amendment right to confront his accuser face-to-face because the camera equipment was not set up to allow Cindy H. to see him while she testified.

### D.

### *Similarity of Defendant's Interest and Motive in*
### *Cross-examining Cindy H. at the Conditional Examination*

Defendant also argues the trial court violated his Sixth Amendment right of confrontation by allowing the conditional examination to be played for the jury because he possessed a substantially different interest and motive in cross-examining Cindy H. during that examination than he did at trial. We disagree.

"A criminal defendant has a constitutionally guaranteed right to confront and cross-examine the witnesses against him or her. [Citations.] The right of confrontation is not absolute, however, and may 'in appropriate cases' bow to other legitimate interests in the criminal trial process. [Citations.] An exception to the confrontation requirement exists where the witness is unavailable, has given testimony at a previous judicial proceeding against the same defendant, and was subject to cross-examination by that defendant. [Citations.] Further, the federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer. [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1172.)

In *People v. Zapien* (1993) 4 Cal.4th 929 (*Zapien*), our Supreme Court held the admission of an unavailable witness's preliminary hearing testimony "is permitted under

19

Evidence Code section 1291[4] and does not offend the confrontation clauses of the federal or state Constitutions." (*Id*. at p. 975.) This is so, explained the court, "not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution." (*Ibid*., citing *Ohio v. Roberts* (1980) 448 U.S. 56, 64 [65 L.Ed.2d 597, 606]; see also *California v. Green* (1970) 399 U.S. 149, 165-168.) And while a defendant's motive for cross-examining a witness during a preliminary hearing will often differ from his motive for cross-examining that witness at trial, the court explained that "these motives need not be identical, only 'similar.' " (*Zapien*, *supra*, 4 Cal.4th at p. 975, quoting *People v. Alcala* (1992) 4 Cal.4th 742, 784.)

Defendant asserts his motive for cross-examining Cindy H. during the conditional examination was not similar to his motive for cross-examining her at trial because a one-strike torture allegation was added to count 4 after the conditional examination was conducted. According to defendant, "[t]he significance of the newly added one-strike torture allegation dramatically eclipsed everything else against which [he] needed to defend because it so greatly increased the amount of prison time he faced. Given the allegation's severity, the defense had a very strong interest and motive to focus its cross examination of [Cindy H.] upon it at trial. In contrast, the defense had scant incentive in

---

[4] Evidence Code section 1291 provides in relevant part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

pursuing such questioning at [Cindy H.]'s earlier conditional examination because the allegation had not even been brought."

As the trial court correctly observed, the information charged defendant with the substantive crime of torture at the time of the conditional examination. Thus, defendant had a motive for cross-examining Cindy H. concerning whether he "inflict[ed] great bodily injury" on her "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) The one-strike torture allegation added after the conditional examination subjected defendant to a term of 25 years to life for the crime of unlawful sexual penetration with a foreign object if, "in the commission of" that crime, he inflicted torture in violation of section 206. (§ 667.61, subds. (a), (d)(3).) Accordingly, defendant complains he did not have an adequate opportunity to cross-examine Cindy H. concerning whether he inflicted torture "in the commission of" the sex offense within the meaning of section 667.61, subdivision (d)(3).

In *People v. Jones* (2001) 25 Cal.4th 98 (*Jones*), our Supreme Court held that the defendant, who wielded a knife against his victim after he sexually assaulted her, used the weapon "in the commission of" the sex offenses within the meaning of section 667.61, former subdivision (e)(4).[5] (*Id.* at p. 109.) The court explained that whether the defendant used the knife in the commission of the sex offenses was "not ' "a matter of semantics or simple chronology." ' Instead, 'the focus is on the relationship between the [sex offenses] and the [use of the weapon].' [Citation.]" (*Ibid.*) "[T]he dispositive question is whether the relationship between the [sex offenses] and [the use of the weapon] was sufficiently close to justify an enhanced punishment." (*Ibid.*) Moreover,

---

[5] This subdivision provided: "The defendant personally used a dangerous or deadly weapon or firearm in the commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or 12022.53." (Stats. 1998, ch. 936, § 9, p. 6875.)

21

regardless of whether the use of the weapon "occurred *before, during, or after* the technical completion of the felonious sex act," the "operative question is whether the sex offense posed a greater threat of harm, i.e., was more culpable − − because the defendant used a deadly weapon to threaten or maintain control over his [or her] victim." (*Id*. at pp. 109-110.)

We first note Cindy H.'s testimony supports the conclusion that the sex offense was part of a continuous course of torturous conduct, beginning with the assault that rendered her a quadriplegic, including the insertion of the batteries into her rectum, and continuing throughout the night while defendant refused to call for an ambulance despite her obvious agony and inability to move. Indeed, the insertion of the batteries evinces a sadistic intent on the part of defendant. And while the great bodily injury was inflicted before the batteries were inserted, the jury could infer from their insertion that defendant also possessed a sadistic intent when he inflicted the great bodily injury. Second, and more importantly, as *Jones*, *supra*, 25 Cal.4th 98 makes clear, the question of whether defendant inflicted torture in the commission of the sex offense depends not on whether he inflicted great bodily injury on Cindy H. with the requisite mental state *during the technical completion of the sex act*, i.e., while he placed the batteries into her rectum. On this point, Cindy H. testified that defendant broke her back before he sexually assaulted her. The dispositive question is whether the relationship between the sex offense and the torture was sufficiently close to justify an enhanced punishment. Thus, even if defendant is correct that the torture occurred before the sex offense, this offense "posed a greater threat of harm, i.e., was more culpable" (*Jones*, *supra*, 25 Cal.4th at p. 110), because the torture rendered Cindy H. a quadriplegic and therefore unable to resist the sexual assault.

At trial, defendant did not dispute his violent assault against Cindy H. resulted in her quadriplegia or that he sexually assaulted her. He did dispute whether his actions amounted to torture. He had a strong motive to cross-examine Cindy H. concerning the torture count during the conditional examination. Because further cross-examination

22

concerning the timing of events would not have changed the fact the torturous assault that rendered Cindy H. a quadriplegic rendered the subsequent sexual assault more culpable, we cannot conclude defendant's motive to cross-examine Cindy H. at trial was substantially different from his motive to cross-examine her during the conditional examination.

Nor are we persuaded defendant's motive for cross-examining Cindy H. concerning the one-strike torture allegation at trial was dissimilar to his motive for cross-examining her concerning the substantive crime of torture at the conditional examination simply because the one-strike allegation carried a term of 25 years to life, as opposed to the life term attached to the torture count (§ 206.1). (See *People v. Wharton* (1991) 53 Cal.3d 522, 589-590 [defendant's motive in cross-examining alleged victim at preliminary hearing in unrelated rape prosecution was sufficiently similar to motive in cross-examining this witness during penalty phase of subsequent capital murder trial to warrant admission of preliminary hearing testimony]; see also *People v. Ogen* (1985) 168 Cal.App.3d 611, 617 [defendant's motive in cross-examining murder victim at preliminary hearing in prior related kidnap-rape prosecution was sufficiently similar to motive in cross-examining this witness during subsequent murder trial to warrant admission of preliminary hearing testimony].)

The trial court did not violate defendant's right of confrontation by allowing Cindy H.'s conditional examination to be played for the jury.

## II

### *Amendment of the Information*

In a related argument, defendant asserts the trial court violated his Sixth Amendment right of confrontation, as well as his Fourteenth Amendment right to due process, by allowing the prosecution to amend the information to add the one-strike torture allegation to count 4. He is mistaken.

23

"Due process requires that 'an accused be advised of the charges against him [or her] so that he [or she] has a reasonable opportunity to prepare and present his [or her] defense and not be taken by surprise by evidence offered at his [or her] trial.' [Citation.] Thus, it is the rule that 'a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing or arising out of the transaction upon which the commitment was based.' [Citations.]" (*People v. Graff* (2009) 170 Cal.App.4th 345, 360 (*Graff*).)

In accordance with this rule, our Supreme Court has interpreted sections 739 and 1009 to " 'permit amendment of the information to add charges or enhancements which are supported by the actual evidence at the preliminary hearing, provided the facts show due notice by proof to the accused.' [Citations.]" (*People v. Superior Court (Mendella)* (1983) 33 Cal.3d 754, 764, superseded by statute on another point as stated in *In re Jovan B.* (1993) 6 Cal.4th 801, 814, fn. 8.) "Under section 739, 'the law is settled that unless the magistrate makes factual findings to the contrary, the prosecution may amend the information after the preliminary hearing to charge any offense shown by the evidence adduced at the preliminary hearing provided the new crime is transactionally related to the crimes for which the defendant has previously been held to answer.' [Citations.] 'Under the case law interpreting section 1009, the test applied is whether or not the amendment changes the offense charged to one not shown by the evidence taken at the preliminary examination. [Citation.]' [Citation.] As long as the above standards are met, there is no bar to adding to the information enhancement allegations that were not charged in the complaint." (*Mendella, supra,* 33 Cal.3d 754; § 1009 ["indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination"].)

Defendant does not dispute that the one-strike torture allegation was shown by the evidence adduced at the preliminary hearing. Nor does he dispute the transactional

24

relationship between this allegation and the crimes for which he was held to answer. Instead, he relies on *Graff*, *supra*, 170 Cal.App.4th 345, and *People v. Berkowitz* (1977) 68 Cal.App.3d Supp. 9 (*Berkowitz*), disapproved on other grounds in *People v. Superior Court* (*Douglass*) (1979) 24 Cal.3d 428, in arguing he was prejudiced by the "late amendment" of the information. Such reliance is misplaced.

In *Graff*, *supra*, 170 Cal.App.4th 345, the Court of Appeal reversed the defendant's convictions on two counts of committing a lewd or lascivious act on a child of 14 or 15 years in violation of section 288, subdivision (c), "because the jury was permitted to convict based on charges not established at the preliminary hearing." (*Id*. at p. 349.) The defendant was initially charged with six such counts. At the preliminary hearing, the victim testified to five incidents of lewd conduct committed by the defendant, two of which involved defendant watching her masturbate. Because the victim was not certain whether the masturbation incidents occurred before or after she turned 16 years old, the magistrate dismissed the two counts that were based on these incidents. After the hearing, an information was filed charging the defendant with three counts of violating section 288, subdivision (c). (*Id*. at pp. 350-351.)

At trial, the victim testified to the same five incidents of lewd conduct. She was allowed to testify concerning the masturbation incidents "as indicative of motive or intent" under Evidence Code section 1101. (*Graff*, *supra*, 170 Cal.App.4th at p. 352.) This time, she testified she was 15 years old when the first masturbation incident occurred, but was unsure when the second incident occurred. (*Id*. at p. 354.) In the defense closing argument, defense counsel stated that there were "[n]o charge[s] concerning the masturbation episodes." (*Id*. at p. 357.) In rebuttal, the prosecutor disagreed and argued the defendant could be convicted of "*any lewd act that he committed with* [*the victim*] *while she was 14 or 15 years old,*" including the masturbation incidents. (*Id*. at p. 358.) The jury convicted the defendant of two counts of violation of section 288, subdivision (c). (*Id*. at p. 360.)

25

The Court of Appeal reversed, holding that the defendant's "due process rights to notice of the charges against him were violated by the prosecution's decision to go forward with charges not established at the preliminary hearing." (*Graff*, *supra*, 170 Cal.App.4th at p. 360.) The court first explained the magistrate was correct in ruling "the prosecution failed to present evidence [at the preliminary hearing] that the masturbation incidents fell within the time frame necessary to establish a section 288, subdivision (c)(1), violation." (*Id*. at p. 361.) The court then explained "the prosecution did not seek, and the trial court did not permit, an amendment [of the information] at any time." (*Id*. at p. 362.) In response to the Attorney General's argument that " 'the trial court's act of allowing the jury to convict [defendant] on the basis of [the masturbation] incidents amounted to a constructive amendment' " of the information, the court explained such an amendment would not have been proper because "late amendments are not permitted where the defendant would be prejudiced. [The defendant] was prejudiced by the failure of the prosecution to make its theory clear prior to the last phase of closing argument. In cross-examining [the victim], defense counsel had no reason to pin down the dates of the masturbation incidents or to impeach [the victim] with her earlier testimony that she could not remember when either of the incidents occurred." (*Ibid*.) The court further explained that, "even where the prosecution complies with the necessary procedures and no specific prejudice is shown, appellate courts are compelled to reverse convictions where substantial evidence was presented at trial that did not correspond to the charges established at the preliminary hearing." (*Ibid*.)

Defendant argues: "Thus, *Graff* stands for the proposition that the amendment of an accusatory pleading after the close of evidence to place in dispute an essential element previously of no real consequence prejudices a defendant's 'substantial rights' if the element presents fertile grounds for cross-examination." "[B]ecause the most crucial evidence against [defendant] was already closed," i.e., Cindy H.'s conditional examination testimony, the amendment adding the one-strike torture allegation "had all

26

the hallmarks of a 'late amendment.' " Defendant argues he was prejudiced by this late amendment because: "Had defense counsel known that the relationship between the torture and sexual penetration charges was at issue when he examined [Cindy H.] − - indeed so much so as to elevate [defendant's] exposure to 25 years to life imprisonment − - he could have questioned her in an effort to undermine any connection between the two." We disagree for two reasons.

First, defendant mischaracterizes the holding in *Graff*, *supra*, 170 Cal.App.4th 345. As explained, *Graff* held that the defendant's "due process rights to notice of the charges against him were violated by the prosecution's decision to go forward with charges not established at the preliminary hearing." (*Graff*, *supra*, 170 Cal.App.4th at p. 360.) Here, Cindy H.'s preliminary hearing testimony established that defendant "inflict[ed] great bodily injury" on her "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) This testimony also established that he did so "in the commission of" the crime of unlawful sexual penetration with a foreign object. (§ 667.61, subd. (d)(3).) Accordingly, unlike *Graff*, the information in this case was not amended to add a charge or enhancement allegation that was not established at the preliminary hearing.

Second, we disagree that defendant was prejudiced by the amendment because his attorney was unable to question Cindy H. concerning the connection between the torture and the sexual assault. As we explained in the previous section of this opinion, defendant had an adequate opportunity to cross-examine Cindy H. concerning the facts surrounding the torture during the conditional examination. As defendant acknowledges, Cindy H. testified that defendant inserted the batteries into her rectum after she was already paralyzed. Nevertheless, defendant posits that his attorney "could have sought to elicit, for example, that [defendant] penetrated [Cindy H.] *before* he subjected her to any serious physical abuse, i.e., just after she voluntarily took off her bathing suit bottom to become completely naked before him." However, even if defendant inserted the batteries

27

into Cindy H.'s rectum before he viciously assaulted her, this would not negate the connection between the sex offense and the torture for purposes of section 667.61 subdivision (d)(3). Indeed, this order of events would cause the case to more closely resemble *Jones*, *supra*, 25 Cal.4th 98, where the sex offense was technically completed before the knife was used to maintain control over the victim. Similarly, here, even if the sex offense was technically completed before the torture began, this offense still "was more culpable" because defendant used the subsequent debilitating assault to maintain control over his victim. (*Id*. at p. 110.)

Defendant further posits that "counsel could have sought to elicit that [Cindy H.] and/or [defendant] left and then returned to the apartment after the sexual penetration and before the torture. If such cross-examination were successful, it would have undermined that [defendant] maintained control over [Cindy H.] during one 'continuous transaction' involving both the sex crime and torture." This is pure speculation. Cindy H. testified quite clearly that she was paralyzed when the sexual assault occurred. Thus, she did not possess the ability to leave the apartment. And even if defendant left, this would not have lessened the control he had over Cindy H. by virtue of her inability to move. Further, it does not matter whether defendant left and came back because torture can be committed by a course of conduct over time. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1427-1429.) We find no prejudice.

Nor are we persuaded by defendant's reliance on *Berkowitz*, *supra*, 68 Cal.App.3d Supp. 9. There, a misdemeanor complaint charging the defendant with two counts of practicing medicine without a license was amended at the close of the trial to add two new counts alleging he also dispensed dangerous drugs without a good faith prior examination. (*Id*. at p. 12.) With respect to the newly-added counts, the appellate department of the Los Angeles County Superior Court reversed the defendant's convictions, explaining: "We think that the action of the trial court clearly prejudiced the substantial rights of the defendant. As a matter of elemental due process it prevented his

28

counsel from conducting research to see whether testimony could be presented to overcome the new charge. It requires no citation of authority to state the proposition that the giving of notice is a basic essential of due process." (*Id*. at p. 14.) Acknowledging the rule that trial amendments in felony cases are limited to charges supported by the evidence at the preliminary hearing, the People argued misdemeanor cases "are not as serious and 'it is more a matter of determining the propriety and fairness of adding a new count' in a misdemeanor case." (*Ibid*.) The court responded "that the unfairness is inherent in requiring an unprepared and unforewarned defendant to submit *an already tried case* to a jury without any opportunity to think about a defense to a newly interposed charge." (*Id*. at pp. 14-15.)

Here, unlike *Berkowitz, supra,* 68 Cal.App.3d Supp. 9, the amendment was supported by evidence taken at the preliminary hearing. This supplied sufficient notice to satisfy defendant's due process rights.

There was no due process violation. And for reasons expressed previously, we also find no violation of defendant's right of confrontation.

### III

### *Denial of Defendant's Request for a Continuance*

In the alternative, defendant claims the trial court prejudicially erred when it denied his motion for a continuance rather than construe that motion as a request to discharge the jury, declare a mistrial, and have the case set for trial at a later date. Not so.

"Granting or denying a motion for midtrial continuance is within the sound discretion of the trial court, which must consider not only the benefit the moving party anticipates, but also the likelihood the benefit will result." (*People v. Gonzales* (2011) 52 Cal.4th 254, 291.) The trial court must also consider " 'the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in

29

a reversal of a judgment of conviction.' " (*Zapien*, *supra*, 4 Cal.4th at p. 972; *People v. Fudge* (1994) 7 Cal.4th 1075, 1105-1106.)

As mentioned, defendant objected to playing Cindy H.'s conditional examination for the jury and asked for a continuance of an unspecified duration, as he put it, "to see if we can obtain [Cindy H.'s] testimony either live or by video conference." The trial court denied the motion, noting that Cindy H. could be on the ventilator for two or three weeks and may lose the ability to speak if a tracheotomy is performed. The trial court also noted that, "in the best case scenario, it would be at least a month before she could testify in a reasonable and informed way," and there was "no guarantee at all that [she] will be available to testify" because "she may not survive at all." The trial court concluded: "So there is not a rationale [*sic*] reason to continue based on really only a possibility that at some future point far beyond the normal termination of this trial that [Cindy H.] would be able to testify."

We find no abuse of discretion. Nor does defendant argue the requested continuance should have been granted. Instead, citing *People v. Ramirez* (1972) 27 Cal.App.3d 660 (*Ramirez*), he argues the trial court should have construed his motion for a continuance as a request to discharge the jury, declare a mistrial, and have the case set for trial at a later date.

In *Ramirez*, the defendant was arraigned on an information charging him with escape from state prison. He pled not guilty. After the jury was sworn, the trial court allowed the prosecution to amend the information to add a charge of escape by a person committed as a narcotic addict. Defense counsel requested a continuance of "[t]wo or three weeks" to prepare to go to trial on the new charge. (*Ramirez*, *supra*, 27 Cal.App.3d at pp. 668, 663.) The trial court granted the continuance and asked defense counsel whether the case should be referred back to the criminal department for the setting of a new trial date. Counsel agreed. The trial court then assigned the case back to the criminal department and discharged the jury. Following the subsequent trial, defendant

30

appealed his conviction and argued that double jeopardy principles barred retrial on the charge of escape. (*Id*. at p. 668.) The Court of Appeal disagreed, holding that defendant had impliedly consented to the discharge of the jury through his attorney's request for a continuance of two to three weeks together with his request that the case be referred back to the criminal department for the setting of a new trial date. (*Id*. at pp. 669-670.)

Nothing in *Ramirez, supra,* 27 Cal.App.3d 660 suggests the trial court has a sua sponte duty to construe a motion for a lengthy midtrial continuance as a request to discharge the jury, declare a mistrial, and have the case set for trial at a later date. Moreover, had the trial court done so, an argument could be made that, unlike *Ramirez,* defendant's attorney did not request that the case be referred back to the criminal department for the setting of a new trial date. Thus, discharge of the jury may well have prevented retrial. We need not resolve this question here. We do hold that the trial court was not required to construe defendant's motion for a continuance as a request to discharge the jury and declare a mistrial.

## IV

### *Admission of a Prior Act of Domestic Violence*

We also reject defendant's contention the trial court prejudicially erred in admitting into evidence a July 4, 1998, act of domestic violence perpetrated against defendant's former girlfriend, Cynthia Nielsen.

### A.

### *Additional Background*

Nielsen testified to four incidents of domestic violence committed by defendant between 1998 and 1999. The consumption of alcohol preceded each assault. Because defendant challenges the admission of only the first of these assaults, we shall not recite the details of the other three incidents.

Defendant moved in with Nielsen and her daughter sometime in 1997. On July 4, 1998, after visiting a bar and attending a barbeque, defendant and Nielsen were driving to

31

defendant's mother's house to pick up Nielsen's daughter. As Nielsen drove, defendant started hitting her. She stopped the car, got out, and ran across a field. Defendant gave chase, caught up to her, and "started beating on [her] in the face." When she fell to the ground, defendant climbed on top of her and continued the assault. He then "put his hands around [her] throat, and he said 'I've never killed anyone before, but now I have to kill you.' " While she was being choked, Nielsen managed to say her daughter's name, which prompted defendant to release her throat. Still on top of Nielsen, defendant "just sat back" and "looked at [her]." Nielsen said: "We have to go." They then went back to the car and continued on to defendant's mother's house. When they arrived, Nielsen screamed out for her daughter, who ran outside to see what was going on. Nielsen and her daughter then ran "six or eight blocks" to a friend's house, where police and paramedics were called. Nielsen was taken to the hospital. While there were no broken bones, "both eyes were black and swollen" and she "had bruises all over."

## B.

### *Analysis*

Generally, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) However, with certain exceptions, Evidence Code section 1109[6] provides that, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) One such exception is found in subdivision (e), which provides: "Evidence of acts

---

[6] References to subdivisions of section 1109 are to Evidence Code section 1109.

occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." (§ 1109, subd. (e).)

Thus, where a prior act of domestic violence is not more than 10 years old, evidence of the act is *admissible* unless the trial court determines the "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, §§ 352, 1109, subd. (a)(1).) Where the prior act of domestic violence is more than 10 years old, evidence of the act is *inadmissible* unless the trial court determines "the admission of this evidence is in the interest of justice." (§ 1109, subd. (e).) Both determinations are reviewed for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531, 539 (*Johnson*).)

Here, as defendant correctly observes, the July 4, 1998, act of domestic violence committed against Nielsen occurred more than 10 years before the charged crimes, subjecting it to the "more stringent standard of admissibility" of subdivision (e). (*Johnson*, *supra*, 185 Cal.App.4th at p. 539.) However, "the 'interest of justice' requirement obviously was not intended to present an insurmountable obstacle to admission of more remote prior conduct. Nor do we think subdivision (e) necessitates an inquiry different in kind from that involved in a determination under [Evidence Code] section 352. The [Evidence Code] section 352 balancing approach gives consideration to both the state's interest in a fair prosecution and the individual's constitutional rights. We believe this same type of analysis is appropriate for the 'interest of justice' exception under subdivision (e). [¶] To the extent a higher degree of scrutiny is called for, it is the conclusion drawn from the balancing test, not the process itself, that must change under subdivision (e). Under subdivision (a)(1) and [Evidence Code] section 352, evidence may be excluded only where its probative value is 'substantially outweighed' by its prejudicial effect [or the other statutory counterweights, i.e., undue consumption of time,

33

confusion of the issues, and misleading the jury].  Though it reversed the presumption in subdivision (e), we believe the Legislature intended to allow admission of evidence whose probative value weighs more heavily on those same scales." (*Ibid*.)

## 1.

### *Probative Value*

The probative value of the July 4, 1998, incident was great.  " 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.  Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)  "Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' [Citation.]  Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation.  [Citation.]  Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence.  [Citation.]  This pattern suggests a psychological dynamic not necessarily involved in other types of crimes.  [Citation.]" (*Johnson*, *supra*, 185 Cal.App.4th at p. 532; see also *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.)

Here, the July 4, 1998, incident was similar in character to the charged crimes and was committed against a similarly situated person.  Prior to each incident, defendant had been drinking.  In both incidents, defendant violently assaulted his girlfriend in a manner that made it difficult for her to get help.  This was accomplished in the July 4, 1998, incident by assaulting Nielsen on a rural road, where her only means of escape was running through a field.  In the charged crimes, as well as the other assaults committed against Cindy H., defendant blocked her access to the door to the apartment and either

34

told her to remove her clothes or removed them for her. While factually different, it can be inferred from each incident that defendant's motive was to prevent his victim's escape. Moreover, both incidents involved a level of violence that required trips to the hospital. In the July 4, 1998, incident, defendant severely beat, choked, and threatened to kill Nielsen. In the charged crimes, defendant broke Cindy H.'s spine, resulting in quadriplegia.

Paraphrasing the opinion in *Johnson*, *supra*, 185 Cal.App.4th at page 533, the common factors in each incident strongly suggest defendant has a problem with anger management, specifically with regard to female intimate partners, and specifically when he has been drinking. He has also shown a pattern of attempting to limit their means of escape and inflicting serious injury during the assault. "Whatever the psychological forces at work, the Legislature has concluded that in these types of cases, evidence of past domestic violence is particularly probative of the likelihood to repeat such behavior." (*Ibid.*)

We also note the probative value of the July 4, 1998, incident is enhanced by the fact that Nielsen's testimony was independent of the charged offenses. (*Johnson*, *supra*, 185 Cal.App.4th at p. 533.) And while more than 10 years passed between the July 4, 1998, incident and the charged offenses, defendant has not "led a substantially blameless life in the interim." (*Id*. at p. 534.) Indeed, the July 4, 1998, incident was the first of four assaults committed against Nielsen. In each of those assaults, defendant continued the pattern of becoming violent after drinking. This pattern continued when he became intimately involved with Cindy H. The incident that encompasses the charged offenses was the last of "four or five" assaults against her. Thus, the passage of about 11 years between the July 4, 1998, incident and the charged crimes does not "significantly lessen the probative value of [the] evidence." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [uncharged molestation incident involving prior victim occurred about 12 years prior to trial; probative value not significantly lessened because only a few years elapsed between

35

the time defendant stopped molesting that victim and started molesting victim of the charged crimes].)

## 2.

### *Prejudicial Effect and the Other Statutory Counterweights*

The probative value of the July 4, 1998, incident was not outweighed by the danger of undue prejudice. " 'The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses.' " (*People v. Hollie*, *supra*, 180 Cal.App.4th at p. 1274.)

Here, as was the case in *Johnson*, *supra*, 185 Cal.App.4th 520, defendant was convicted of the July 4, 1998, assault on Nielsen. "Although the jury was not so informed, the fact that the prior misconduct had resulted in conviction . . . reduced the likelihood that defendant could have produced evidence to rebut [Nielsen's] testimony. Therefore, the unfairness of forcing a defendant to mount a defense against evidence of a long-past incident was not a legitimate consideration in this case." (*Id*. at p. 533.)

Also like *Johnson*, *supra*, 185 Cal.App.4th 520, the July 4, 1998, incident was "somewhat inflammatory." (*Id*. at p. 533.) Defendant assaulted Nielsen, chased her into a field to continue the assault, threatened to kill her, and then choked her, stopping only after she said her daughter's name. However, the trial court concluded this incident was "less severe than the incident charged," which it characterized as "one of the more severe instances of domestic violence this court has seen outside, of course, of murder." We agree with this assessment. While damaging, the July 4, 1998, incident was not unduly prejudicial. "[E]vidence is unduly prejudicial under [Evidence Code] section 352 only if it 'uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues' [citation], or if it invites the jury to prejudge "'a person or cause on the basis of extraneous factors.'" [Citation.] 'Painting a person

36

faithfully is not, of itself, unfair.' " (*Id*. at p. 534, quoting *People v. Harris* (1998) 60 Cal.App.4th 727, 737.)

Finally, presentation of the July 4, 1998, incident did not "necessitate undue consumption of time" or "create substantial danger of . . . confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Nielsen's testimony about this incident spanned slightly more than two pages of transcript. She covered all four prior incidents in less than seven pages of transcript. With respect to confusing the issues or misleading the jury, more than eight years elapsed between the last assault on Nielsen and the first assault on Cindy H. Thus, like *Johnson*, *supra*, 185 Cal.App.4th 520, "[t]he past acts of violence were separated by time and involved [a] different victim[] and witness[]. And there was no deception or confusion engendered by the arguments of counsel." (*Id*. at p. 533.)

The trial court did not abuse its discretion in concluding the July 4, 1998, assault against Nielsen was admissible under section 1109, subdivision (e).

# V

## *Sexual Penetration Instruction*

Defendant further asserts his sexual penetration conviction must be reversed because CALCRIM No. 1045 "related the necessary mental state of sexual abuse, gratification or arousal to only the prohibited act of sexual penetration." Defendant argues this instruction should also have related this mental state to "the means by which the sexual penetration is accomplished, i.e., the application of force, fear etc." Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We find no error, much less a miscarriage of justice.

37

Section 289, subdivision (a)(1)(A), provides: "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years." Subdivision (k)(1) of this section provides: " 'Sexual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

As relevant to the claimed instructional error, CALCRIM No. 1045 informed the jury: "The defendant is charged in Count Four with sexual penetration by force in violation of . . . Section 289. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1.) The defendant committed an act of sexual penetration with another person. [¶] 2.) The penetration was accomplished by using a foreign object. [¶] 3.) The other person did not consent to the act. [¶] And 4.) The defendant accomplished the act by force, violence, duress, menace or fear of immediate and unlawful bodily injury to another person. [¶] Sexual penetration means penetration however slight of the anal opening of the other person for the purpose of sexual abuse, arousal or gratification. [¶] Penetration for sexual abuse means penetration for the purpose of causing pain, injury or discomfort."[7]

---

[7] The instruction continued: "In order to consent, a person must act freely and voluntarily and know the nature of the act. [¶] Evidence that the defendant and the other person dated is not enough by itself to constitute consent. . . . [¶] An act is accomplished by force if a person uses enough physical force to overcome the other person's will. [¶] Duress means a direct or implied threat of force, violence, danger, hardship or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or to submit to something that she [or he] would not otherwise do or submit to. [¶] When deciding whether the act was accomplished by duress, consider all the circumstances including the age of the other person and her [or his] relationship to the defendant. [¶] Retribution is a

38

The trial court also instructed the jury with CALCRIM No. 252, providing that "[t]he crimes and other allegations charged in this case require proof of the union or joint operation of act and wrongful intent," and described "unlawful sexual penetration with the foreign object as charged in Count Four" as a "specific intent" crime, requiring that defendant "must not only intentionally commit the prohibited act or intentionally fail to do the required act, but must do so with a specific intent and mental state. The act and the specific intent and mental state required are explained in the instruction for that crime or allegation."

Defendant claims the specific intent required for the crime of unlawful sexual penetration is like that required for the crime of robbery. He argues: "The mental state for robbery, the intent to permanently deprive, applies to two acts necessary for commission of the offense —- (1) the taking of the victim's property and (2) the means by which the taking is accomplished, i.e., the application of force or fear. [Citation.] If the defendant applies force to the victim for a purpose unrelated to theft, such as anger, fear, jealousy, or revenge, and then, seeing the victim disabled, decides to take advantage of the situation by taking an item of his or her personal property, the offense is not robbery because 'there is no "joint operation of act and intent. . . ."' [Citations.] The pattern instruction defining robbery explicitly requires concurrence between the prohibited mental state and both prohibited acts, the taking of property and the application of force or fear. [Citation.] Due to the similarities in definition between the

form of payback or revenge. [¶] Menace means a threat, statement or act showing an intent to injure someone. [¶] An act is accomplished by fear if the other person is actually and reasonably afraid. [¶] The defendant is not guilty of forcible sexual penetration if he [or she] actually and reasonably believed that the other person consented to the act. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the other person consented. [¶] If the People have not met this burden, you must find the defendant not guilty."

39

crimes of robbery and sexual penetration with a foreign object, their concurrence requirements should be interpreted similarly."

The Attorney General argues the crime of unlawful sexual penetration is a general intent crime, requiring defendant to have harbored only the intent to commit the acts constituting the crime. According to the Attorney General's view, "[t]he fact that the term 'sexual penetration' is defined as being for the purposes of sexual abuse[,] arousal[,] or gratification does not mean that the force, violence, or duress be inflicted with the specific intent to commit the act of sexual penetration. [Citations.]"

The case law only tangentially addresses whether the crime of unlawful sexual penetration is a specific or general intent crime and appears to be in conflict.

In *People v. Dillon* (2009) 174 Cal.App.4th 1367, the defendant claimed CALCRIM No. 890, the pattern jury instruction for the crime of assault with intent to commit unlawful sexual penetration (§ 220) was deficient for failing to inform the jury that the prosecution had the burden of proving lack of consent. (*Id*. at p. 1378.) Agreeing with the defendant that section 220 "requires not only the specific intent to commit the underlying sexual act, but a specific intent to commit that act without the consent of the victim," the Court of Appeal nevertheless held that "[a] reasonable juror reviewing CALCRIM No. 1045, as instructed by CALCRIM No. 890, would conclude that unless he acted against the will or consent of the complainant, [the defendant] could not have held the specific intent to commit the crime of penetration of the genital opening of another by force, and therefore could not be guilty of the lesser included assault offense as defined in CALCRIM No. 890." (*Id*. at p. 1379.)

Rejecting the defendant's argument that "because CALCRIM No. 1045 fails to define the intent required for the crime of forcible sexual penetration, the jury would be unable to determine from looking at CALCRIM No. 1045 whether the defendant had the intent to commit that offense when he performed the act constituting the assault," the Court of Appeal stated: "As [the defendant] and the People both agree, and contrary to

40

the trial court's instruction under CALCRIM No. 252, forcible sexual penetration is a general intent crime. The defendant need not harbor the intent to commit a crime as long as he intended to commit the act or acts constituting the crime. But the mental state required to be found guilty of forcible sexual penetration is not the same as the specific intent to commit that crime. [Citation.] Reading CALCRIM No. 1045 to determine the intent required under CALCRIM No. 890, jurors would reasonably conclude that if the prosecution failed to prove the complainant's lack of consent, the defendant could not be guilty of assault with intent to commit forcible sexual penetration." (*People v. Dillon*, *supra*, 174 Cal.App.4th at p. 1380.)

In *People v. Senior* (1992) 3 Cal.App.4th 765, the defendant claimed the trial court erred by failing to instruct the jury that the crime of unlawful sexual penetration required the specific intent to commit the offense "by 'force, violence, duress, menace, or fear of immediate and unlawful injury.' " (*Id*. at p. 776.) The Court of Appeal disagreed, explaining: "This element . . . does not require a specific intent. It describes types of intimidating conduct by the defendant and not any particular state of mind of the defendant. . . . The only specific intent involved in foreign object penetration is 'the purpose of sexual arousal, gratification, or abuse.' (§ 289, subd. (a).)" (*Ibid*.; see also *People v. Stone* (1994) 27 Cal.App.4th 276, 282-283 [assuming defendant submitted case on basis of victim's grand jury testimony, Court of Appeal held this did not amount to a slow plea of guilty because defendant did not concede guilt on charges but instead argued, among other things, that foreign object penetration was not done for sexual arousal or gratification and that voluntary intoxication negated specific intent].)

Based on the language of section 289 and our Supreme Court's guidance with respect to the difference between specific and general intent crimes, we conclude the crime of unlawful sexual penetration requires the specific intent to gain sexual arousal or gratification or to inflict abuse on the victim. However, as long as the act of penetration is done with this specific intent, and that act is "accomplished against the victim's will by

41

means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (§ 289, subd. (a)(1)(A)), the crime has been committed. This is so regardless of whether the force, violence, duress, menace, or fear is also used with the intent to gain sexual arousal or gratification or to inflict abuse on the victim.

" 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' [Citation.]" (*People v. Atkins* (2001) 25 Cal.4th 76, 82.) Stated differently: " 'A crime is characterized as a "general intent" crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a "specific intent" crime when the required mental state entails an intent to cause the resulting harm.' [Citation.]" (*Id.* at p. 86.) "Language that typically denotes specific intent crimes" includes " 'with the intent' to achieve or 'for the purpose of' achieving some further act.' " (*Ibid.*) In determining whether the Legislature intended to create a general or specific intent crime, we must look to the language of the statute.

Issues of statutory interpretation are questions of law subject to de novo review. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492.) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than

42

one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737; *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831.)

As mentioned, section 289, subdivision (a)(1)(A), makes it a felony to commit "an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Read in isolation, this subdivision appears to set forth a general intent crime. (See *People v. DePriest* (2007) 42 Cal.4th 1, 48 ["Forcible rape is a general intent crime involving an act of sexual intercourse accomplished against the victim's will by means of force or fear"].) However, we must read this subdivision together with subdivision (k)(1) of section 289, which defines the act of sexual penetration to be "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening *for the purpose of sexual arousal, gratification, or abuse* by any foreign object, substance, instrument, or device, or by any unknown object." (§ 289, subd. (k)(1), italics added.) This definition refers to the defendant's intent to achieve an "additional consequence," i.e., arousal, gratification, or abuse. (*People v. Atkins*, *supra*, 25 Cal.4th at p. 82.) Thus, in drafting section 289, the Legislature required the act of penetration to be committed with the specific intent to gain sexual arousal or gratification or to inflict abuse on the victim.

CALCRIM No. 1045 accurately described the crime of unlawful sexual penetration for the jury. And CALCRIM No. 252 correctly informed the jury that defendant was required to possess the specific intent described in CALCRIM No. 1045. We find no error.

Nor are we persuaded by defendant's analogy to the crime of robbery. "Robbery is the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211.) Thus, "[r]obbery is larceny with the aggravating circumstances that 'the property is taken from the person or presence of another' and 'is accomplished by the use of force or by putting the victim in fear of injury.' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) While the larceny statute (§ 484) does not set forth the intent required, our Supreme Court has long held the crime to require a specific intent to steal, i.e., "to deprive the owner of the property *permanently*." (*People v. Brown* (1894) 105 Cal. 66, 69; *People v. Kunkin* (1973) 9 Cal.3d 245, 251.) This specific intent requirement is "part of the common law of larceny of which . . . section 484 is declaratory." (*People v. Davis* (1998) 19 Cal.4th 301, 318, fn. 15.) For purposes of larceny, the intent to steal "must exist at the time of the taking and carrying away." (*People v. Turner* (1968) 267 Cal.App.2d 440, 444; § 20 ["In every crime or public offense there must be a union, or joint operation of act and intent, or criminal negligence"].) And while the robbery statute similarly does not set forth the intent required, this crime also requires a specific intent to steal, which must exist at the time of the act of force or intimidation used to accomplish the taking and carrying away. (*People v. Anderson*, *supra*, 51 Cal.4th at p. 994; *People v. Huggins* (2006) 38 Cal.4th 175, 214.) This too is part of the common law of robbery, of which section 211 is declaratory. (See *People v. Gomez* (2008) 43 Cal.4th 249, 254, fn. 2.)

Thus, robbery has been described as "a combination of assault and larceny." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 85, p. 118.) In order to constitute robbery, *both* the assault and the larceny must have been done with the specific intent to steal.

In contrast to robbery, the crime of unlawful sexual penetration contains an express intent requirement that applies *only to the act of penetration*. (§ 289, subd.

44

(k)(1).)  We decline to extend this intent requirement to the act of force, violence, duress, menace, or fear of immediate and unlawful bodily injury.  To do so would contravene the plain meaning of the statute.  Nor is the crime of unlawful sexual penetration a combination of assault and another offense, with common law roots requiring the specific intent necessary to commit the other offense at the time of the assault.  As we have explained, the Legislature did not remain silent with respect to the intent necessary to commit the crime.  It required *the act of penetration* to be done with the intent to gain sexual arousal or gratification or to inflict abuse on the victim, no more and no less.  (§ 289, subds. (a)(1)(A) & (k)(1).)

The trial court did not err by instructing the jury with CALCRIM No. 1045.  And, in any event, any error would be harmless in light of the fact that the intent required to commit the act of sexual penetration includes an intent to abuse, meaning "to injure or hurt badly, not lewdness."  (*People v. White* (1986) 179 Cal.App.3d 193, 205.)  Assuming the jury should have been instructed defendant was required to possess the specific intent to gain sexual arousal or gratification *or to inflict abuse* on Cindy H. while committing the assault that enabled him to penetrate her rectum with the batteries, based on these facts, we have no doubt the jury would have found he possessed the intent to abuse her during both the assault and the sexual penetration.

# VI

### *Denial of Defendant's Motion to Replace Counsel*

Defendant also contends the trial court "mishandled" his final *Marsden* motion, which was considered the same day as a new trial motion, by failing to inquire into his "complaint that trial counsel had provided ineffective assistance in failing to develop mental state evidence during trial and in connection with [the] pending new trial motion."  We are not persuaded.

45

## A.

### *Applicable Law*

Our Supreme Court recently reiterated the rules governing the grant and review of *Marsden* motions: "'In [*Marsden*, *supra*, 2 Cal.3d 118], we held that a defendant is deprived of his [or her] constitutional right to the effective assistance of counsel when a trial court denies his [or her] motion to substitute one appointed counsel for another without giving him [or her] an opportunity to state the reasons for his [or her] request. A defendant must make a sufficient showing that denial of substitution would substantially impair his [or her] constitutional right to the assistance of counsel [citation], whether because of his [or her] attorney's incompetence or lack of diligence [citations], or because of an irreconcilable conflict [citations]. We require such proof because a defendant's right to appointed counsel does not include the right to demand appointment of more than one counsel, and because the matter is generally within the discretion of the trial court. [Citation.]' [Citation.] When reviewing whether the trial court abused its discretion in denying a *Marsden* motion, we consider whether it made an adequate inquiry into the defendant's complaints. [Citation.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1127-1128.)

## B.

### *Defendant's Marsden Motions*

Defendant filed a series of *Marsden* motions in this case. We need not recite in detail the facts surrounding each motion because, except for the final motion, defendant candidly admits "the trial court conscientiously allowed [him] to voice his complaints against counsel, allowed counsel to respond and, based on the information gathered, ruled on whether substitution was warranted." Accordingly, we provide an overview of defendant's *Marsden* motions and recite in detail only the facts relating to the final motion.

# 1.

## *Overview of the Marsden Motions*

The first *Marsden* motion was filed on October 7, 2010, and withdrawn the same day.

On November 9, 2010, defendant made an oral *Marsden* motion. Among other things, defendant complained that his attorney had not spent an appropriate amount of time discussing the case with him. Defendant also complained that, when he asked his attorney about whether he could have a competency hearing, his attorney responded that "he didn't think [defendant] would qualify for it." As mentioned, defendant concedes his attorney addressed each of his concerns at the hearing on the motion. Nor does he dispute that the trial court appropriately denied substitution. After denying the motion, the trial court asked defense counsel to "check with records" and provide the court with specific dates he met with defendant between September and November.

On November 16, 2010, during jury selection, the trial court stated on the record: "The defendant came in before we got on the record, expressed frustration about why he was here. Used the word pro per and indicated he was on medication." The trial court then continued jury selection until the following day for defendant to speak to his attorney.

On November 17, 2010, the trial court explained it had ordered "any psychiatric treatment records that [defendant] received in the jail be made available to [the court] in a sealed fashion," that the court had not looked at them, and would not look at them, unless defense counsel expressed a doubt as to defendant's competency to stand trial. Defense counsel then reviewed the "three-page document" and stated he did not intend to declare a doubt about defendant's competency to stand trial. The trial court then heard from defense counsel, outside the prosecutor's presence, concerning the specific dates he met with defendant at the jail. When asked whether he still wanted to remove his current

47

attorney as his counsel, defendant responded: "No." The trial court confirmed its previous ruling denying substitution.

On November 30, 2010, the evidentiary phase of the trial began. On December 6, 2010, after the prosecution concluded its case-in-chief, defendant took the stand in his own defense. In response to defense counsel's seventh question, asking defendant whether he was present when Nielsen testified, defendant responded: "Your Honor, I ask for a mistrial. [My attorney] has been treating my case as I am [*sic*] guilty. I been [*sic*] in jail all this whole time chained to this chair, chained to that chair." The trial court promptly interrupted defendant, cleared the courtroom, and asked if he was reasserting his *Marsden* motion. Defendant responded: "Yes, your Honor, the whole thing."

Among other things, defendant complained: "Instead of just pleading guilty, your Honor, there are other issues that I want brought up. He just refuse [*sic*] to listen to my story that I had." When asked to elaborate on these other issues, defendant stated: "Well, just my mental state of mind at the time, that doesn't sound like a normal guy doing this stuff." Addressing this concern, defense counsel explained: "My particular relationship with [defendant] is that I tried to be straight forward with him. What I have explained to him is that there is substantial evidence. [¶] I think his best defense lies in an absence of intent to kill and absence of intent to torture." The trial court then asked defense counsel whether he gave defendant an opportunity to explain "what his theory was, why he was doing this or not doing that," and whether defendant answered "at the level of detail [defense counsel] would normally expect." Defense counsel responded: "I asked [defendant] repeatedly what his position was, how he would approach the facts of that evening, and he's never really had much of an explanation other than -- and it is consistent with our defense in this case, he never was trying to kill anybody. He wasn't trying to hurt anybody. It was a drunken fight between a couple which under the law that's not okay, but something of a pattern in his life. [¶] It is a felony assault because

48

she was severely injured, but he was not trying to kill anybody. He wasn't trying to hurt anybody, and that's been consistently his position on the case."

The trial court denied substitution, finding that defense counsel "had a good understanding of [defendant's] point of view and attitudes about the case and his opinion." The trial court also addressed defendant's remaining concerns. Again, defendant does not dispute that the trial court appropriately denied substitution. Following the *Marsden* hearing, defendant decided not to testify. As mentioned, he was convicted of torture, inflicting corporal injury on a cohabitant with an enhancement for inflicting great bodily injury causing paralysis, and unlawful sexual penetration with a one-strike finding he inflicted torture in the commission of the offense.

## 2.

### *Defendant's Final Marsden Motion*

On January 3, 2011, defendant filed a final *Marsden* motion. On February 1, 2011, defense counsel filed a new trial motion arguing that a new trial should be granted because the admission of Cindy H.'s conditional examination testimony violated defendant's Sixth Amendment right of confrontation, the trial court further violated this right by allowing the prosecution to amend the information to add the one-strike torture allegation, and the trial court should not have allowed into evidence prior acts of domestic violence.

On February 4, 2011, before the hearing on the new trial motion, the trial court heard from defendant concerning the *Marsden* motion. The trial court first explained it had reviewed the record of the previous *Marsden* motions. Defendant then stated his complaint: "I contacted [defense counsel] and asked him to come to the jail. . . . I told [defense counsel] I found some evidence under Brady versus Maryland. I would like to have him file motion [*sic*] for new trial. [¶] [Defense counsel] said no without even listening to what I had to say." Defendant elaborated: "[M]y witnesses were talking about me passing out -- not passing out but blacking out. . . . [Y]ou asked [defense

49

counsel] if I was competent to stand in court [*sic*]. Normally people do competency hearing [*sic*], correct?" The trial court explained: "I don't answer those kind[s] of questions because it depends on a whole complexity of facts. [¶] I am trying to get the specific evidence that you brought to his attention or wanted to bring to his attention." Defendant answered: "Mental state of mind at the time of the crime." He went on to explain: "How I wanted to bring it up, the mental state of mind at the time. But I was denied a competency hearing. [¶] I figured if I would had [*sic*] a competency hearing that would have give[n] a qualified witness to testify to my state of mind." Asked who this witness was, defendant answered Cindy H. testified during the conditional examination that he had blacked out in the past and Nielsen also had information concerning incidents of defendant blacking out while they were dating.

The trial court then clarified: "So this is how I'm understanding your complaint. Your complaint is that [defense counsel] should have filed a new trial motion based on the failure to get a competency hearing, or to develop this information in front of the jury?" Defendant answered by further complaining defense counsel did not provide him with a copy of the trial transcript as he requested, defendant had to fight with defense counsel over everything, defense counsel never came to see him during the proceedings, defendant was not allowed to confront his accuser, and defense counsel told the jury defendant was guilty during closing argument.

Defense counsel responded by explaining he had met with defendant twice since the jury returned its verdict. The first meeting was "tense." Defendant wanted a copy of the trial transcript in connection with the new trial motion, and possibly a motion to have the judge removed from the trial. Defense counsel explained he did not see a basis to order the transcript or have the judge removed, prompting defendant to become "upset" and "frustrated." The meeting ended in name calling. After this meeting, defense counsel drafted and filed a new trial motion based on the issues set forth above. He then returned to meet with defendant and had a "productive" meeting discussing the new trial

50

motion and reviewing the probation report in anticipation of the sentencing hearing. With respect to defendant's complaint concerning the closing argument, defense counsel explained he discussed with defendant his strategy of conceding the assault on Cindy H., but attacking the charges of attempted murder and torture based on negating the specific intent required for the commission of those crimes.

The trial court denied the motion. With respect to the confrontation issue, the trial court explained defense counsel was "very aggressive" in arguing that the conditional examination should not be played for the jury. Defendant interrupted with: "He was." Turning to the competency issue, the trial court explained: "There was not given the evidence that I heard both in these in camera hearings, *Marsden* hearings and outside of it, the evidence to express a doubt, and I didn't[,] that would raise competency issues for the trial."

The trial court then commented on the defense strategy: "It is a proper role for the attorney to make strategic decisions. I know you can't see this, but [defense counsel] crafted what I thought was a very shrewd defense given the facts as they existed on your behalf. [¶] A defense that was based on reason, and a defense that was strong given the facts that were in this case, and he was successful as to the attempted murder charge. His argument and how he expressed that argument is within his discretion, but it was certainly effective in part, and it was not unreasonable, and it was clearly an appropriate strategy decision." Turning to the request to review the trial transcript, the trial court explained that "whether or not a copy of the trial transcript is helpful in filing the new [trial] motion" is also a decision for counsel to make. Finally, the trial court found no "fundamental breakdown" in the attorney-client relationship requiring substitution.

Following the *Marsden* hearing, the trial court denied the new trial motion and sentenced defendant to state prison to serve a term of 25 years to life.

51

*Analysis*

Defendant complains the trial court "mishandled" the final *Marsden* motion by failing to inquire into his "complaint that trial counsel had provided ineffective assistance in failing to develop mental state evidence during trial and in connection with [the] pending new trial motion." According to defendant, "[t]he trial court knew from prior *in camera* hearings that [defendant] was confused about what exactly 'competency' meant, but he had linked it to mental state and consistently expressed interest both in having his 'competency' tested and in contesting his mental state. At the previous *Marsden* hearing, the court had also heard [defendant] complain that counsel had not adequately brought up at trial 'my mental state of mind at the time [of the crimes], that doesn't sound like a normal guy doing this stuff.' Additionally, the court was aware that [Cindy H.] had testified in her conditional examination that [defendant] expressed surprise and confusion over [Cindy H.]'s injuries after some of the beatings, drank regularly and had been drinking during the charged incident."

Thus, argues defendant, the trial court was "on notice that one of [his] complaints against counsel at the February 4, 2011, hearing was that counsel should have developed for trial information about [defendant's] 'blacking out' in regards to his mental state at the time of the crimes, and counsel should have sought a new trial based on having failed to do so. . . . [¶] Inexplicably, the trial court never made trial counsel address [this] complaint. It could not, therefore, intelligently rule on whether counsel should be removed because he was providing ineffective assistance."**8**

---

**8** Defendant further argues he stated during the February 4, 2011, hearing that "the information [concerning his mental state] should have been developed in formal proceedings by a 'qualified witness,' presumably a mental health expert. The trial court basically understood [defendant's] claim in this manner as reflected by its summary of [defendant's] remarks." This view of defendant's statements at the *Marsden* hearing is

We conclude the trial court made more than an adequate inquiry into defendant's complaints. As mentioned, "a criminal defendant who seeks to substitute counsel must be allowed to state the specific reasons for his [or her] dissatisfaction with counsel." (*People v. Clemons* (2008) 160 Cal.App.4th 1243, 1250.) That happened here. As mentioned, the trial court understood defendant's complaint to be "that [defense counsel] should have filed a new trial motion based on the failure to get a competency hearing, or to develop this information[, i.e., evidence that defendant had blacked out in the past,] in front of the jury." This understanding is consistent with defendant's argument on appeal. Thus, the trial court heard defendant's complaint.

Once the trial court provides an opportunity to state specific reasons for dissatisfaction with counsel, "it is within the trial court's discretion whether the circumstances justify a substitution of counsel. Substitution is required if the record clearly shows defense counsel is not providing adequate representation or there is such a conflict between the defendant and counsel that ineffective assistance of counsel is likely to result. The trial court's determination will not be disturbed on appeal absent a showing that denial of the motion substantially impaired the defendant's right to the effective assistance of counsel." (*People v. Clemons*, *supra*, 160 Cal.App.4th at p. 1250.) While the trial court did not ask defense counsel during the *Marsden* hearing to specifically address defendant's complaint concerning his failure to put forth additional evidence of defendant's purported blackouts, we conclude the trial court had sufficient information to rule on the motion. Indeed, defendant acknowledges Cindy H. testified during the conditional examination that the morning after some of the beatings, defendant expressed

belied by the record. As set forth above, defendant complained he tried to convince his attorney to file a new trial motion based on evidence of his mental state. He then complained he was denied a competency hearing, in which he believed a "qualified witness" would testify to his mental state. When asked who this witness was, defendant answered "both of them," referring to Nielsen and Cindy H. Defendant was not referring to a mental health expert.

53

confusion about some of her injuries. Cindy H. was unavailable to testify at trial. Thus, there was nothing defense counsel could have done to elicit further information concerning defendant's purported blackouts through her testimony. And assuming Nielsen had information about defendant not remembering his assaults on her, the trial court could reasonably have concluded the failure to elicit such testimony would not have supported the grant of a new trial. Without prejudice flowing from defense counsel's allegedly deficient performance, the trial court could not have found merit in defendant's claim of ineffective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 693-694.) For the same reason, we cannot find denial of the *Marsden* motion substantially impaired defendant's right to the effective assistance of counsel. Accordingly, reversal is not warranted.

## VII

### *Sentencing Issues*

Finally, the parties agree the abstract of judgment does not accurately reflect the oral pronouncement of judgment because it incorrectly states the sentence imposed pursuant to section 667.61, subdivision (d)(3), was stayed. The parties further agree the trial court neglected to impose sentence on counts 2 and 3 before staying the execution of sentence pursuant to section 654. This resulted in an "unauthorized absence of sentence" which must be corrected. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1472 (*Alford*).)

While the parties agree there was error, they disagree on the appropriate remedy. The Attorney General argues that, in order to avoid the "futility and expense" of a new sentencing hearing, we should modify the judgment to impose a life term sentence on count 2, an upper term sentence of four years on count 3, plus a consecutive five-year term for the great bodily injury enhancement. Defendant argues we must either remand the matter to the trial court for a new sentencing hearing or impose the middle term

54

sentence on count 3. We conclude the matter should be remanded to the trial court for the limited purpose of imposing sentence on counts 2 and 3.

In *Alford*, *supra*, 180 Cal.App.4th 1463, the defendant committed burglary and grand theft by entering a Wal-Mart, loading a shopping cart with over $500 worth of meat and camping supplies, and attempting to leave the store without paying. The trial court sentenced him to the middle term of two years for the burglary and stayed imposition of sentence on the grand theft conviction under section 654. (*Id.* at pp. 1466-1467.) We held this resulted in an "unauthorized absence of sentence" because "[a] trial court must impose sentence on every count but stay execution as necessary to implement section 654." (*Id.* at p. 1472.) Citing the "futility and expense" of remanding the case to the trial court for resentencing, we modified the judgment to impose the middle term sentence of two years for the grand theft conviction, explaining, "that is undoubtedly the sentence the trial court would have imposed, because the grand theft involved the same conduct as the burglary." (*Id.* at p. 1473.)

Here, the trial court possesses no discretion but to impose a life term on count 2 (§ 206.1) and a five-year term for the great bodily injury enhancement attached to count 3 (§ 12022.7, subd. (b)). However, count 3 is punishable by "imprisonment in the state prison for two, three, or four years." (§ 273.5, subd. (a).) "Absent some agreement by the defendant or the unavailability of the trial judge for other than internal administrative problems or convenience of the court, or some other good cause shown, a defendant should be able to have the trial judge who was familiar with the evidence at the trial impose sentence." (*People v. Strunk* (1995) 31 Cal.App.4th 265, 275-276, fn. 13.) In *Alford*, we could conclude the trial court would have imposed the middle term sentence on the defendant's grand theft conviction because the trial court imposed a middle term sentence on the burglary conviction based on the same facts that supported the grand theft conviction. Given the facts of this case, the trial court could impose the upper term sentence. But it is not "undoubtedly" the case that the trial court will impose the upper

55

term.  (*Alford*, *supra*, 180 Cal.App.4th at p. 1473.)  Accordingly, we must remand the matter to the trial court for the limited purpose of imposing sentence on counts 2 and 3.

We also direct the trial court to amend the abstract of judgment following resentencing to reflect the sentences imposed on counts 2 and 3, and to further reflect that the sentence imposed pursuant to section 667.61, subdivision (d)(3), was not stayed.

## DISPOSITION

Defendant's convictions are affirmed.  The matter is remanded to the trial court for resentencing on counts 2 and 3.  Following resentencing, the trial court shall amend the abstract of judgment to reflect the sentences imposed on these counts and to reflect the sentence imposed pursuant to Penal Code section 667.61, subdivision (d)(3), was not stayed.  A certified copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.


       HOCH      , J.


We concur:


      ROBIE     , Acting P. J.


     MURRAY   , J.

56