Filed 12/29/23  P. v. Young CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CHARLES YOUNG,<br><br>      Defendant and Appellant. | C097135<br><br>(Super. Ct. No. 21FE017018) |

After spending time drinking alcohol and watching football at a Sunday barbeque hosted by her boyfriend Kevin B. (Kevin) on October 3, 2021, at about midnight, R. Doe (R.) and Kevin went to bed in the converted garage at Kevin's house.  At some point, R. came to and realized there was a man's penis in her mouth.  She then felt someone kiss her neck and roughly grab her vagina, inserting his fingers.  When she opened her eyes, she discovered defendant Charles Young, Kevin's neighbor, standing over her.

1

A jury found defendant guilty of sexual penetration of an unconscious victim and not guilty of oral copulation of an unconscious victim. The trial court sentenced defendant to the middle term of six years in prison for sexual penetration of an unconscious victim.

On appeal, defendant asserts (1) the trial court prejudicially erred in its instructions to the jury that suggested sexual penetration of an unconscious person was a general intent (rather than a specific intent) crime, (2) the prosecutor *committed* misconduct in his rebuttal closing argument by stating the jury could not find a reasonable doubt in the absence of some evidentiary support, thus shifting the burden of proof, and (3) the cumulative effect of these errors was prejudicial.

While we agree instructional error and prosecutorial misconduct occurred, we conclude the errors were harmless beyond a reasonable doubt, whether considered individually or cumulatively. We affirm the judgment.

BACKGROUND

Defendant was charged in an amended information with sexual penetration of an unconscious victim (Pen. Code, § 289, subd. (d); count one)[1] and oral copulation of an unconscious victim (§ 287, subd. (f); count two). The information alleged three circumstances in aggravation. (Cal. Rules of Court, rule 4.421(a)(3), (b)(2), (b)(5).)

*The Prosecution's Case*

R. testified that, on October 3, 2021, she and her boyfriend Kevin hosted a barbecue at his house. They did so every Sunday during the football season; everyone would get together and watch football. Defendant was Kevin's next-door neighbor and he regularly attended the barbecues. R. was familiar with defendant, and they were polite

---

[1] Undesignated statutory references are to the Penal Code.

2

and friendly, but they did not interact with each other very much. Sometimes they would smoke marijuana together.

On October 3, 2021, 15 to 20 people attended the barbecue, including defendant. At approximately midnight, R. and Kevin closed the door of the garage, which was converted into a bedroom, and went to bed. R. had a lot to drink that evening so she "passed out" in bed with Kevin.

At some point R. woke up when someone inserted a penis into her mouth. Assuming it was Kevin, R. did not initially open her eyes. The person withdrew his penis from her mouth and then kissed her on her neck. Then he roughly grabbed her vagina, inserting his fingers. R. jumped "because it was so rough," and, at that time, her arm struck Kevin who was in bed next to her. She thought, "[i]f this is Kevin, who in the hell is this above me," and she opened her eyes to discover defendant standing over her. R. screamed and Kevin woke up and saw defendant standing by the bed. Kevin demanded, "what the hell are you doing in here," and defendant responded, "Why you guys fuckin' trippin'?" Defendant ran out of the garage, Kevin followed, and R. called 911.

Officer Andrew Schaner was dispatched to Kevin's house at approximately 1:30 a.m. R. told him what had happened. However, she did not disclose the information "[a]bout . . . sucking his penis" because Kevin was nearby, and R. felt ashamed. Although she declined to go to a hospital for an examination that night, an officer did take a swab from her neck. The officer also took a buccal swab for a reference sample.

Officer Schaner attempted to take a statement from defendant, who had been detained in his front yard. Defendant appeared to be inebriated. Defendant told Schaner he had been at Kevin's house watching football, and that his interactions with R. were limited to greetings. He stated he did not have physical contact with her that night or ever.

3

At some point, a cell phone was discovered in R. and Kevin's bed that did not belong to them and had not been there when R. went to bed. The phone number matched defendant's cell phone number.

Detective Matthew Wollman interviewed defendant at the jail, beginning at approximately 7:40 a.m. Defendant "seemed relatively sober." Defendant stated he had "smoked a little bit [of] weed," and drank a cup of Hennessey. Defendant said he did not feel intoxicated. Wollman asked if defendant remembered everything that happened the night before, and defendant responded, "nothing sexual." He told Wollman his DNA would not be found on R., and her DNA would not be found on him. He said he did not come into physical contact with her at all. He did tell Wollman that he previously smoked marijuana with R. However, as Wollman understood it, defendant indicated his only interaction with R. the prior evening was greeting each other. When Wollman asked if he ever went into Kevin's garage, defendant said he entered the garage to retrieve a chess set. However, he had no explanation for why his phone was in R.'s bed. Law enforcement collected swabs and fingernail scrapings from defendant.

The next day, Detective Wollman accompanied R. to a forensic examination. Without Kevin present, R. clarified that, when the incident began, defendant's penis "was fully in her mouth and fully erect at the time." She told Wollman she had begun to wake up, realized there was a penis in her mouth, believed it was Kevin's, and therefore allowed it to remain there for a time before discovering Kevin in bed next to her.

A nurse, who testified as an expert in sexual assault examinations, examined R. She took several swabs and performed a pelvic exam. She found a bruise on R.'s thigh and petechiae where her upper lip and gums met. She did not find any injury in R.'s vaginal area. The nurse testified that, "[a]bout 50 percent of the time there are no findings." The nurse opined that R.'s condition was consistent with what she reported. She also testified the petechiae were consistent with oral copulation. A criminalist from the Sacramento County Crime Lab testified as an expert in DNA detection and analysis

4

and the statistical significance of DNA comparison. Defendant's DNA was found on two swabs taken from the right side of R.'s neck. In reference to the defendant's left fingernail scrapings, the criminalist testified it was "at least 136 times more likely to obtain the DNA results if [defendant], [R.] and a random unrelated individual are contributors to the mixture than if [defendant] and two random unrelated individuals are contributors." As to his right fingernail scrapings, it was "at least 101 times more likely to obtain the DNA results if [defendant] and [R.] are contributors to the mixture than if [defendant] and a random unrelated individual are contributors." The criminalist excluded R. as a contributor to defendant's penile and scrotal swabs.

### The Defense Case

Officer Michael Hamilton arrived at Kevin's house at approximately 1:45 a.m. and interviewed Kevin inside the garage while R. spoke with firefighters in the driveway. The rollup garage door was down at the time.

Dr. Dan Field, an emergency medicine physician, testified as an expert in injuries, emergency medicine, and trauma analysis. He testified that petechiae resulting from forced or unforced oral copulation will typically be found on the soft palette. The literature Field reviewed indicated there was a low rate of injuries associated with forced copulation inside the mouth, and petechiae on the inner lip was not mentioned as an injury resulting from such circumstances. He testified the injury to R.'s lip was not of a type that would commonly result from oral copulation.

### Verdict and Sentencing

The jury found defendant guilty of count one, sexual penetration of an unconscious victim, and not guilty of count two, oral copulation of an unconscious victim. In a bifurcated proceeding, the trial court found true the three aggravating circumstances as alleged. The court sentenced defendant to the middle term of six years on count one.

5

DISCUSSION

I

*Instructional Error*

Defendant asserts the trial court erred in instructing the jury that sexual penetration of an unconscious person was a general intent crime rather than a specific intent crime. The People agree the court erred by instructing the jury with CALCRIM No. 250 but not with CALCRIM Nos. 251 or 252. We agree with the parties as to the error, but conclude it was harmless beyond a reasonable doubt.

A. *Additional Background*

The trial court instructed the jury with CALCRIM No. 250, the general intent instruction, as follows: "The crimes charged in Counts 1 and 2, each require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crimes in this case, that person must not only commit the prohibited acts, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime."

As to count one, the court instructed the jury with CALCRIM No. 1048, in part, as follows: "The defendant . . . is charged in Count 1 with sexual penetration of a person who was unconscious of the nature of the act in violation of . . . section 289[, subdivision ](d). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of sexual penetration with another person; [¶] 2. The penetration was accomplished by using a foreign object, substance, instrument, device or unknown object; [¶] 3. The other person was unable to resist because she was unconscious of the nature of the act; [¶] AND [¶] 4. The defendant knew that the other person was unable to resist because she was unconscious of the nature of the act. [¶] Sexual penetration means penetration, however slight, of the genital or anal opening of the other person, for the purpose of sexual abuse, arousal, or gratification."

6

B. *Standard of Review*

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) "A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

C. *Analysis*

A "violation of section 289 is a specific intent crime." (*People v. Saavedra* (2018) 24 Cal.App.5th 605, 613 (*Saavedra*); accord, *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1539-1540.) "A trial court has a sua sponte duty to instruct a jury on specific intent when the offense requires it." (*People v. Ngo* (2014) 225 Cal.App.4th 126, 162.)

Here, the trial court instructed the jurors with CALCRIM No. 250. As the People note, the Judicial Council's bench notes to CALCRIM No. 250 state: "this instruction **must not** be used if the crime requires a specific mental state, such as knowledge or malice, even if the crime is classified as a general intent offense. In such cases, the court must give CALCRIM No. 251, *Union of Act and Intent: Specific Intent or Mental State*." (Bench Notes to CALCRIM No. 250 (Rev. 2022).) The bench notes to CALCRIM No. 251 state: "This instruction **must** be given if the crime requires a specific mental state, such as knowledge or malice, even if the crime is classified as a general intent offense." The trial court here did not instruct the jury with CALCRIM No. 251. (Bench Notes to CALCRIM No. 251 (Rev. 2008).) Nor did it instruct the jury with CALCRIM No. 252, which, according to the bench notes, may be given "in cases involving both

7

offenses requiring a specific intent or mental state and offenses that do not, rather than giving both CALCRIM No. 250 and CALCRIM No. 251." (Bench Notes to CALCRIM No. 252 (Rev. 2017).)

Because violation of section 289 is a specific intent crime (*Saavedra*, *supra*, 24 Cal.App.5th at p. 613), the trial court erred in failing to instruct with either CALCRIM No. 251 or CALCRIM No. 252 (*People v. Ngo, supra*, 225 Cal.App.4th at p. 162).

D.  *Prejudice*

Defendant asserts the error was one of federal constitutional dimension and cannot be deemed harmless.  The People respond that the error was harmless beyond a reasonable doubt because the court correctly instructed the jury on the required intent. We agree with the People.

"Courts have differed concerning the proper standard for assessing prejudice with respect to this type of error." (*Saavedra*, *supra*, 24 Cal.App.5th at p. 615.)  We will conclude the error was harmless under the more stringent standard of *Chapman v. California* (1967) 386 U.S. 18, at page 24.  Under *Chapman*, the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.)  To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, the reviewing court examines "the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

Under similar circumstances, the court in *Saavedra*, addressing prejudice, stated: "CALCRIM No. 1128 correctly set out the elements—including the intent—required for the jury to convict defendant of sexual penetration of a child 10 years of age or younger, as charged in count 11.  The language of the instruction covered both the requisite intent per se and the requirement of a concurrence of act and specific intent.  The record on

8

appeal—which we have carefully reviewed—contains no evidence that could rationally lead to a finding the act of penetration charged in count 11 was committed for a purpose other than sexual arousal, gratification, or abuse.  Moreover, defendant did not contest the element, but rather denied any culpability.  Since no rational jury could have found the specific intent element unproven, the error was harmless beyond a reasonable doubt." (*Saavedra*, *supra*, 24 Cal.App.5th at pp. 615-616, fn. omitted.)

Similar to *Saavedra*, here, CALCRIM No. 1048 correctly set out the elements-- including the intent--required for the jury to convict defendant of sexual penetration of an unconscious victim.  (See *Saavedra*, *supra*, 24 Cal.App.5th at p. 615.)  Specifically, CALCRIM No. 1048 instructed that "sexual penetration means penetration . . . *for the purpose of sexual abuse, arousal, or gratification*."  (Italics added.)  "The language of the instruction covered both the requisite intent per se and the requirement of a concurrence of act and specific intent."  (*Saavedra*, at pp. 615-616.)  As in *Saavedra*, the record contains no evidence that could rationally lead to a finding that the sexual penetration was committed for any purpose other than "sexual abuse, arousal, or gratification." (CALCRIM No. 1048; see *Saavedra*, at p. 616.)  And defendant did not contest the specific intent element, but rather denied culpability.  (*Saavedra*, at p. 616.)

Defendant contends the record contains substantial evidence he was highly intoxicated at the relevant time, and asserts that, by informing the jury that the crime only required a general intent, it rendered evidence of his intoxication irrelevant.  This evidence was relevant, he maintains, because evidence of unconsciousness caused by voluntary intoxication can negate specific intent.  (§ 29.4, subd. (b) ["[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent"].)  He asserts the instructional error precluded the jury from considering evidence of intoxication that would have undermined the conclusion that he acted with the requisite specific intent, and, had the jury been able to

9

consider his intoxication in assessing his mental state, there is a reasonable probability he would have achieved a more favorable result.

In the pages defendant cites as providing substantial evidence he was highly intoxicated, Officer Schaner testified that, when he detained defendant, defendant "appeared to be inebriated" and "under the influence of alcohol," and Detective Wollman testified that, when he was initially contacted, he "was informed that [defendant] was highly intoxicated." Wollman's testimony was elicited as a contrast to what defendant told him during the interview, specifically that he had a cup of Hennessey to drink and he had "smoked a little bit [of] weed." Wollman also testified that, when he met with defendant at the jail, defendant appeared to be "relatively sober," although this was several hours after the incident. Thus, the evidence potentially conflicted on the extent defendant's alcohol and/or marijuana consumption affected him.

As the People observe, the trial court does not have a sua sponte duty to instruct with CALCRIM No. 3426 on voluntary intoxication and that the jury may consider voluntary intoxication in deciding whether the defendant acted with a specific intent. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014.) The court here did not instruct the jury with CALCRIM No. 3426. Without this instruction, even if the jurors had been given CALCRIM No. 251, they would not have been informed that evidence, if any, of defendant's voluntary intoxication could be considered "only in deciding whether the defendant" acted with the requisite specific intent and for no other purpose. (CALCRIM No. 3426.) In the absence of CALCRIM No. 3426, the omission of CALCRIM No. 251 would have had no effect on the jury's consideration of defendant's intoxication; that instruction would have offered no guidance on the subject.

At trial, defense counsel argued that defendant did not commit the act *at all*, not that he committed the act without the requisite specific intent. (See *Saavedra*, *supra*, 24 Cal.App.5th at p. 616 ["defendant did not contest the element, but rather denied any culpability"].) Defendant asserts the arguments of counsel do not limit the evidence and

10

theories the jury may consider. He argues there is no authority for the position that "a jury may only consider a defendant's intoxication" in the context of a specific intent crime "if his counsel specifically raised the subject as an affirmative defense at trial." But assuming this premise is true, it is of little help to defendant here. We presume the jury considered the evidence of defendant's intoxication insofar as it was relevant. (*People v. Harris* (1994) 9 Cal.4th 407, 431 [we presume jury considered all relevant evidence before it].) The jury nevertheless necessarily determined that, when defendant committed sexual penetration, he did so with the specific intent of doing so for the purpose of sexual abuse, arousal, or gratification as instructed by CALCRIM No. 1048. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196 ["[t]he jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so"].)

Defendant emphasizes that the prosecutor argued in closing that there was no defense of voluntary intoxication in this case. In fact, the prosecutor stated, "[t]his is a general intent crime," although it is not clear to what crime he was referring. Based on this argument, defendant asserts that, "[w]hen a prosecutor's argument relies on instructional error for at least part of its support, prejudice necessarily emerges." The cases he cites, however, do not support this premise. For example, in *People v. Godinez* (1992) 2 Cal.App.4th 492, the court opined that the harmful effect of an erroneous instruction may be "magnified" by the prosecutor's closing argument. (*Id*. at p. 504.) Here, the prosecutor's argument did not *establish* prejudice; it was one *consideration* in the prejudice analysis. (*Id*. at pp. 503-505.) While the prosecutor argued evidence of intoxication was irrelevant and referenced a general intent crime, this does not "necessarily" establish prejudice as defendant claims. The trial court instructed the jury on the specific intent required to find defendant guilty on count one, that he committed sexual penetration "for the purpose of sexual abuse, arousal, or gratification." (CALCRIM No. 1048.) We presume the jury considered the evidence of intoxication

11

insofar as relevant. (*People v. Harris, supra*, 9 Cal.4th at p. 431.) Further, the trial court instructed the jurors that they "must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) And, we cannot conclude the prosecutor's brief reference to an unspecified crime as one of "general intent" resulted in prejudice.

The evidence here strongly supported the jury's verdict on count one. R. testified she woke up with a penis into her mouth and was then kissed on the neck and grabbed by the genitals. She opened her eyes to discover defendant standing over her. Kevin also saw defendant there and followed him as he ran out. Defendant's cell phone was discovered in R.'s bed and had not been there when she lay down. A nurse who performed a sexual assault examination of R. opined that her condition was consistent with what she reported. A DNA expert testified defendant's DNA was found on two separate swabs taken from the right side of R.'s neck. The DNA evidence also suggested R.'s DNA was found in both of defendant's fingernail scrapings.

There was evidence R. made inconsistent representations concerning the alleged oral copulation. The defense expert did not believe the injury in her mouth was likely to have resulted from oral copulation. Additionally, Officer Hamilton's testimony suggested that--contrary to R.'s representation--she was not in Kevin's immediate presence when initially describing the incident, undermining her claim that she omitted the description of oral copulation because she was ashamed to disclose that detail in front of Kevin. And the DNA expert excluded R. as a contributor to defendant's penile and scrotal swabs. This evidence, while all potentially favorable to the defense, was largely relevant to count two, oral copulation of an unconscious victim. The jury found defendant not guilty on that count. Beyond having some relevance to R.'s credibility, this evidence was largely irrelevant to count one.

Defendant asserts this was a close case. He quotes *People v. Brown* (1993) 17 Cal.App.4th 1389 on this point as stating, "this was a close case. The victim's testimony was vague in many aspects and inconsistent in others. The jury apparently found it to be a close case because they were only able to reach a verdict on one of the two counts." (*Id*. at p. 1398, fn. omitted.) But beyond her inconsistent statements concerning oral copulation, R.'s testimony was not particularly vague or inconsistent. And the jury here reached verdicts on both charged counts. We are not persuaded this was a particularly close case, at least with regard to count one.

We are convinced beyond a reasonable doubt that omitting CALCRIM No. 251 from the instructions did not contribute to the verdict on count one. As in *Saavedra*, "[s]ince no rational jury could have found the specific intent element unproven, the error was harmless beyond a reasonable doubt." (*Saavedra*, *supra*, 24 Cal.App.5th at p. 616.)

II

*Prosecutorial Misconduct*

Defendant asserts the prosecutor committed misconduct by stating that the jury could not find a reasonable doubt in the absence of some evidentiary support, shifting the burden of proof. We agree the prosecutor erroneously shifted the burden of proof, but conclude the error was harmless beyond a reasonable doubt.

A. *Additional Background*

While discussing the reasonable doubt standard during his rebuttal closing argument, the prosecutor argued: "And in considering what a reasonable doubt is, you've got to look to the root of the word 'reasonable.' It's reason. A reasonable doubt is based on your reason. It's based on your logic. It's based on your common sense. And in order for a doubt to be reasonable, in order for it to be more than just the imaginary set of facts or possible facts that were never actually testified to in this case or anything even close to them, in order for a doubt to become reasonable, it has to be supported by evidence." Defense counsel objected and the trial court advised the jurors it would

13

instruct them on the law. The prosecutor continued, "Otherwise, if it's not supported by evidence, then it's not reasonable. Then it is just imaginary." Defense counsel again objected and the court overruled the objection. The prosecutor continued: "It is just imaginary. It is just a possibility. It's not reasonable because it's not supported by the evidence."

B. *Standard of Review*

" ' 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' " unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." ' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.) To prevail on a claim of prosecutorial misconduct in closing argument, the defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

C. *Analysis*

Defendant analogizes the prosecutor's argument here to that in *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*). In *Hill*, the prosecutor, discussing the reasonable doubt standard, stated: " 'it must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt*.' " (*Id*. at p. 831.) After the court overruled defense counsel's objection, the prosecutor in *Hill* continued: " 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' " (*Ibid*.)

The Supreme Court in *Hill* stated, "to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was

14

mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence." (*Hill*, *supra*, 17 Cal.4th at p. 831.) However, the Supreme Court also observed that, "[o]n the other hand, [the prosecutor] may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind." (*Id.* at p. 832.) Ultimately, the court concluded the prosecutor committed misconduct "insofar as her statements could reasonably be interpreted as suggesting to the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt." (*Id.*, at p. 831.) While the court characterized the matter as an arguably close question, the court concluded that it was "reasonably likely [the prosecutor]'s comments, taken in context, were understood by the jury to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id.* at p. 832.)

The prosecutor's argument here is sufficiently similar to that in *Hill* such that we conclude it was reasonably likely the prosecutor's comments were understood by the jury as suggesting defendant had the burden of producing evidence to raise a reasonable doubt of his guilt. (*Hill, supra*, 17 Cal.4th at p. 832.) The argument was error.

D. *Prejudice*

Prejudice resulting from prosecutorial misconduct is evaluated under *Chapman* to the extent federal constitutional rights are implicated and under *People v. Watson* (1956) 46 Cal.2d 818, if only state law issues are involved. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) We conclude the defendant did not suffer prejudice even under the more stringent *Chapman* standard.

Following objection to this portion of the prosecutor's argument, the trial court advised the jurors that it would instruct them on the law. Subsequently, the court instructed that the jurors "must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The court

15

instructed the jury on the reasonable doubt standard, both before and after the presentation of evidence: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant's guilt beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (CALCRIM No. 220.)

"The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 196.) Under these circumstances, even under the more stringent *Chapman* standard, we conclude the prosecutor's misconduct in discussing the reasonable doubt standard in a manner that appeared to shift the burden of proof to defendant was harmless beyond a reasonable doubt.

III

*Cumulative Error*

Defendant asserts the cumulative effect of the asserted errors requires reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.) The errors identified above "were harmless, whether considered individually or collectively." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no prejudice when considering defendant's

16

claims separately.  Viewed cumulatively, our conclusion is the same.  Defendant was not deprived of a fair trial.

DISPOSITION

The judgment is affirmed.


      /s/
_____
Duarte, J.

We concur:


    /s/
_____
Robie, Acting P. J.


    /s/
_____
Boulware Eurie, J.